[No. S042656. Oct. 12, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
RONNY GLASER, Defendant and Appellant.

**COUNSEL**

Peter Dodd, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Michael J. Weinberger and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent.

Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—May police officers searching a private home pursuant to a search warrant briefly detain a person who enters onto the premises at the same time as officers are beginning the search? Under the circumstances

of this case, we conclude the officers' initial detention of defendant was justified by the need to determine defendant's identity and connection to the premises and to protect the officers' own safety.

Following the superior court's denial of his motion to suppress evidence (Pen. Code, § 1538.5), defendant Ronny Glaser pled no contest to a charge of possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)) and was sentenced to state prison. The Court of Appeal reversed, holding defendant's suppression motion should have been granted. We reverse the judgment of the Court of Appeal and remand the cause to that court for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

The facts are taken from the evidence presented at the hearing on defendant's motion to suppress. Michael Murray, an investigator for the Glenn County District Attorney assigned to the Glenn County Narcotics Task Force, testified he and five other officers from various agencies executed a search warrant at the home of Gregory Wagenman on February 19, 1993. The search began sometime between 6 p.m. and 7 p.m. The evening was dark and the weather stormy. The residential search was apparently for illegal drugs or associated items.[1]

As the search party approached the residence, Murray saw defendant, in a pickup truck, pass them on the road. When the officers arrived at the residence the pickup was parked in the driveway. The driveway led to the backyard of the house, which was entered through a gate located about 50 feet from the house itself. Murray estimated defendant arrived 20 seconds before the searchers. When the officers arrived, defendant had alighted from his truck and was "about to open the gate."

Murray, the only officer to testify at the suppression hearing, did not witness defendant's initial detention. Upon arrival Murray went inside to help secure the interior of the house. When he returned to the driveway three or four minutes later, he found defendant already detained at gunpoint by Officer Hughes and Lieutenant Oliver.

Defendant testified he was "at the gate" when he first saw and heard Officer Hughes. He did not recognize Hughes, who was in plain clothes, as

---

[1]The warrant is not in the record, and there was no explicit testimony the search was for illegal drugs. The inference, however, is inescapable. Murray testified he had been associated with the narcotics task force for 15 years and he described a highway patrolman participating in the search as a "narcotics assignee." A previous search of the Wagenman residence had resulted in narcotics offense convictions. In his written suppression motion, defendant stated he arrived at the Wagenman residence "while the members of the Glenn County Narcotics task force was [sic] in the process of serving a search warrant for drugs."

a police officer and did not see the officer's gun. Defendant was "standing in a dark spot and he [Hughes] yelled something," but defendant did not understand what he was saying: "I heard him say a phrase at one point, I thought he was talking about the weather because it was stormy, probably a good two minutes before I actually understood what he was talking about when he said, get down on the ground." On cross-examination, defendant denied he was under the influence of drugs at the time of his detention, but explained he had "just woke[n] up."

Eventually defendant understood he was being ordered to lie face down on the gravel driveway. According to defendant, Hughes told him "to get down on the ground immediately, at gunpoint and said if I did not do so he would blow my brains out." Defendant obeyed, and Hughes then cuffed his hands behind his back. Another officer arrived within five minutes, and about a minute later defendant was allowed to stand up and was led into the house. Defendant testified he first saw Murray inside the house, but conceded Murray may have been present while he was detained outside as well.

We are concerned here only with the validity of the initial period of detention by Officer Hughes, ending when Murray returned to the driveway area. The propriety of defendant's continued detention from that point on, and of the ensuing patdown and other searches, was not decided by the Court of Appeal or raised in the petition, and we decline to decide that question. The events following Murray's return to the driveway, therefore, will be described only briefly and only to provide factual context. Information acquired by the police after the initial detention, of course, is not relevant to the legality of that detention.

Murray, shining his flashlight on defendant's face, recognized him; he knew defendant had been arrested on narcotics and weapons charges during a previous search of the Wagenman residence and that defendant had at some point suffered a felony conviction and been committed to the California Rehabilitation Center. Murray watched as Hughes patted defendant down for weapons, removing from his coat pocket a glass pipe suitable for smoking methamphetamine and marijuana. Murray then contacted and detained a woman who was sitting in defendant's pickup truck. Defendant was taken inside and further detained. Murray subsequently searched defendant's truck, in which he found syringes and a police scanner radio, and defendant's person, on which he found three packets of methamphetamine powder.

Defendant was charged with possession and use of methamphetamine (Health & Saf. Code, §§ 11377, subd. (a), 11550, subd. (a)) and use of a scanner to intercept police radio communications (Pen. Code, § 636.5). He

moved in the superior court to suppress the evidence found in the searches of his truck and person. The court ruled both the initial detention and the subsequent searches proper. The court expressly found that the residence was being searched pursuant to warrant, that Hughes detained and "secured" defendant at the ·gate "for purposes of officer's safety," and that Murray observed and recognized defendant while he was being detained outside the house.

Defendant pleaded no contest to the possession charge, and the remaining charges were dismissed. Defendant appealed his conviction on grounds of erroneous denial of the suppression motion. (See Pen. Code, § 1538.5, subd. (m).) The Court of Appeal reversed. The court agreed with defendant's contention "the police did not have articulable suspicion to detain him as he was merely a visitor at the Wagenman residence." Relying on *People* v. *Gallant* (1990) 225 Cal.App.3d 200 [275 Cal.Rptr. 50], the court held "a policy of securing everyone within the vicinity of the area to be searched for officer safety cannot supplant the requirement that articulable suspicion support each detention." Further concluding that the subsequent searches of the truck, the metal box and defendant's person were tainted by the initial illegal detention, the court declined to reach any other issues involving the legality of those searches.

We granted review on the People's petition, which raised only the single issue decided by the Court of Appeal, to wit, the legality of defendant's initial detention.

## DISCUSSION

### I

■ The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

The superior court's express factual findings are supported by substantial evidence; indeed, they are largely undisputed. There is no dispute the officers had a warrant to search the Wagenman residence or that Officer Hughes stopped defendant at the gate to the backyard.

The People do not dispute that Hughes effected a detention of defendant and, hence, a seizure of his person. (See *Florida* v. *Royer* (1983) 460 U.S. 491, 498 [75 L.Ed.2d 229, 236-237, 103 S.Ct. 1319] [a detention, unlike a consensual encounter, is a "seizure" within the meaning of the Fourth Amendment]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 19, fn. 16 [20 L.Ed.2d 889, 904-905, 88 S.Ct. 1868] [a seizure occurs when an officer restrains a person's liberty by force or show of authority]; accord, *People* v. *Souza* (1994) 9 Cal.4th 224, 229 [36 Cal.Rptr.2d 569, 885 P.2d 982].) They argue the detention was not "unreasonable" (U.S. Const., 4th Amend.) because defendant's presence at the search site, as the search began, justified a brief detention to determine his connection to the premises and to ensure police safety during the search. Defendant, in contrast, argues that as a mere visitor to the residence, without any obvious connection to the suspected criminal activities, he was not subject to any detention at all.

■ To decide whether relevant evidence obtained by assertedly unlawful means must be excluded in a trial for crimes allegedly committed after June 8, 1982, we look exclusively to whether its suppression is required by the United States Constitution. (*People* v. *Souza, supra,* 9 Cal.4th at p. 232; *In re Lance W.* (1985) 37 Cal.3d 873, 885-890 [210 Cal.Rptr. 631, 694 P.2d 744].) In the present case, we find the analytical framework needed to resolve this question in two leading decisions of the United States Supreme Court.

■ In the landmark case of *Terry* v. *Ohio, supra,* 392 U.S. 1 (hereafter *Terry*), the federal high court considered whether and when police may constitutionally "stop and frisk" individuals in public places without probable cause to arrest or search. Such conduct, the court noted, "has not been, and as a practical matter could not be, subjected to the warrant procedure," but instead "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." (*Id.* at p. 20 [20 L.Ed.2d at p. 905], fn. omitted.) Application of that general standard, in turn, requires the courts to identify the government interest allegedly justifying the intrusion and to balance " 'the need to search [or seize] against the invasion which the search [or seizure] entails.' " (*Id.* at p. 21 [20 L.Ed.2d at p. 905], quoting *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 534-535 [18 L.Ed.2d 930, 938-939, 87 S.Ct. 1727], brackets in *Terry*.)

Central to the *Terry* court's understanding of reasonableness is the requirement of "specificity in the information upon which police action is predicated . . . ." (*Terry, supra,* 392 U.S. at p. 21, fn. 18 [20 L.Ed.2d at p. 906].) Thus, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Id.* at p. 21 [20 L.Ed.2d at p. 906], fn. omitted.)

In *Terry*, two government interests justified the limited seizure and search: the interest in effective crime prevention, which dictates police investigation of reasonable suspicions of criminal activity, and the police officer's need to ensure his or her safety while engaged in investigation or other activities. (*Terry, supra*, 392 U.S. at pp. 22-24 [20 L.Ed.2d at pp. 906-908].) In view of the American criminal's "long tradition of armed violence," the high court reasoned, "we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." (*Id.* at pp. 23-24 [20 L.Ed.2d at pp. 907-908].) Consequently, the court concluded officers may undertake a properly limited search for weapons if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Id.* at p. 27 [20 L.Ed.2d at p. 909].) Although we deal here with a detention rather than a search, we believe officer safety to be one of the government interests justifying the government intrusion in this case as well.

In *Michigan* v. *Summers* (1981) 452 U.S. 692 [69 L.Ed.2d 340, 101 S.Ct. 2587] (hereafter *Summers*), the high court applied the principles enunciated in *Terry* and its progeny to a detention during the search of a private residence. Detroit police officers, arriving with a warrant to search a house for narcotics, encountered the defendant walking down the front steps. They requested his help in entering the house, but he said he had left his keys inside. The officers then detained the defendant while they gained entry and searched the house. Upon finding drugs and learning the defendant owned the house, the officers arrested and searched him, finding more drugs on his person. (*Summers, supra*, 452 U.S. at p. 693 [69 L.Ed.2d at pp. 343-344].)

The high court focused on whether the defendant's initial detention met "the ultimate standard of reasonableness embodied in the Fourth Amendment." (*Summers, supra*, 452 U.S. at pp. 699-700 [69 L.Ed.2d at p. 348].) To decide the question the court examined "both the character of the official intrusion and its justification." (*Id.* at p. 701 [69 L.Ed.2d at pp. 348-349].) The court noted several factors it believed lessened the intrusiveness of a detention in these circumstances: detention of a resident is less significant than the more substantial invasion to which he was already subject by virtue of the warrant, to wit, search of his home; most occupants would prefer to remain on the premises anyway, in order to observe the search; detention during a warrant search is unlikely to be exploited or unduly prolonged by officers for investigatory purposes, since they are expecting to find the evidence they seek through the search itself; and the detention adds only minimally to the public stigma associated with the search itself. (*Id.* at pp. 701-702 [69 L.Ed.2d at pp. 348-350].)

The court then identified three police interests furthered by the detention: preventing flight in the event incriminating evidence is found, minimizing risk of harm to the officers, and facilitating an orderly search through cooperation of the residents, who would have access to locked areas. On the matter of officer safety, the court noted that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." (*Summers, supra,* 452 U.S. at pp. 702-703 [69 L.Ed.2d at pp. 349-350], fn. omitted.)

Finally, the court examined "the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant." (*Summers, supra,* 452 U.S. at p. 703 [69 L.Ed.2d at p. 350].) It found grounds for such suspicion in the issuing magistrate's determination of probable cause to believe someone in the home is committing a crime. "The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies detention of that occupant." (*Id.* at pp. 703-704 [69 L.Ed.2d at p. 351].) The court therefore held "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (*Id.* at p. 705 [69 L.ED.2d at p. 351], fns. omitted.)

## II

Applying the principles enunciated in the above decisions, we conclude Officer Hughes's initial brief detention of defendant was justified by the need to determine what connection defendant, who appeared to be more than a stranger or casual visitor, had to the premises, and by the related need to ensure officer safety and security at the site of a search for narcotics. To test the detention against "the ultimate standard of reasonableness embodied in the Fourth Amendment" (*Summers, supra,* 452 U.S. at pp. 699-700 [69 L.Ed.2d at p. 348]), we balance the extent of the intrusion against the government interests justifying it, looking in the final and dispositive portion of the analysis to the individualized and objective facts that made those interests applicable in the circumstances of the particular detention. (*Terry, supra,* 392 U.S. at p. 21 [20 L.Ed.2d at pp. 905-906]; *Summers, supra,* 452 U.S. at p. 703 [69 L.Ed.2d at p. 350].)

We examine first the "character of the official intrusion." (*Summers, supra,* 452 U.S. at p. 701 [69 L.Ed.2d at p. 349].) As already mentioned, the

People do not dispute that defendant was detained by a show of police authority. ■ Such a detention, even if brief, is a sufficiently significant restraint on personal liberty to require objective justification. (See *Florida* v. *Royer, supra*, 460 U.S. at p. 498 [75 L.Ed.2d at pp. 236-237] [a person "may not be detained even momentarily without reasonable, objective grounds for doing so"].)

■ In addition, both defendant and investigator Murray testified defendant was detained at gunpoint, a factor increasing the intrusiveness of the detention.[2] ■ As defendant points out, under some circumstances a detention at gunpoint may be deemed a full arrest, justifiable only by the existence of probable cause. (E.g., *United States* v. *Ramos-Zaragosa* (9th Cir. 1975) 516 F.2d 141, 144 ["under circumstances not suggesting fears for their [the officers'] personal safety"].) In other instances, however, the information available to officers, and the circumstances in which they find themselves, will justify the drawing of weapons without the existence of probable cause. (E.g., *U.S.* v. *Blanco* (6th Cir. 1988) 844 F.2d 344, 350-351 [officers reasonably drew weapons before entering dimly lit motel room believed occupied by drug couriers]; *United States* v. *Taylor* (9th Cir. 1983) 716 F.2d 701, 708-709 [police had information suspects were dangerous].)

The scope of intrusion permitted without a warrant or probable cause "will vary to some extent with the particular facts and circumstances of each case," and there is no "litmus-paper test" for distinguishing an investigatory stop from a full arrest. (*Florida* v. *Royer, supra*, 460 U.S. at pp. 500, 506 [75 L.Ed.2d at pp. 238, 242].) ■ Consequently, we must consider the totality of the circumstances (*People* v. *Souza, supra*, 9 Cal.4th at p. 235) to determine if the means used by the police, including detention at gunpoint, were justified by the need of a "reasonably prudent" officer (*Terry, supra*, 392 U.S. at p. 27 [20 L.Ed.2d at p. 909]) to protect himself and others involved in the search. This case, we emphasize, does not involve an extended custodial seizure, which can be justified only by probable cause and not by any more general considerations of reasonableness. (See *Dunaway* v. *New York* (1979) 442 U.S. 200, 212-213 [60 L.Ed.2d 824, 835-836, 99 S.Ct. 2248].)

Several circumstances diminish the intrusiveness of the initial detention here. First and foremost, it was extremely brief. Defendant testified "probably a good two minutes" elapsed before he understood what Hughes was

---

[2]Defendant testified he was also ordered briefly to the ground and handcuffed during the period before investigator Murray arrived. Murray, in a contrasting but not necessarily conflicting account, testified defendant was not yet handcuffed, and was standing, when he arrived. For purposes of our discussion, we assume defendant was, as he testified, placed on the ground and handcuffed immediately.

saying and submitted to detention. Murray testified he was inside the house only three or four minutes before returning to the gate area. It can thus be inferred Hughes detained defendant for a period of two minutes or less before Murray returned to the area. While the length of the detention is only one circumstance, here its brevity weighs heavily in favor of a finding of reasonableness. (See *United States* v. *Sharpe* (1985) 470 U.S. 675, 686-688 [84 L.Ed.2d 605, 615-617, 105 S.Ct. 1568] [20-minute investigative detention reasonable under circumstances].)

Second, the detention occurred not in a public place, but at the back gate of a private residence and was apparently witnessed only by another police officer (and possibly by a passenger in defendant's truck). The embarrassment and stigma sometimes associated with a detention were thus reduced or eliminated. (See *Summers*, *supra*, 452 U.S. at p. 702 [69 L.Ed.2d at pp. 349-350].) Finally, the detention was incidental to the search under warrant; there was no evidence of an independent investigatory purpose. As explained in *Summers*, detentions in the course of a premises search are inherently less likely to be abused than those undertaken in order to investigate the person detained: "[T]he type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." (*Id.* at p. 701 [69 L.Ed.2d at p. 349], fn. omitted.)

We turn next to the government interests justifying defendant's detention. Two interrelated justifications are readily identifiable on this record: the officers' concern for security while they executed the search warrant and their interest in determining what connection, if any, defendant had with the premises being searched.

The police interest in protecting against violence during the search of a home for narcotics has been widely recognized. "In the narcotics business, 'firearms are as much "tools of the trade" as are most commonly recognized articles of narcotics paraphernalia.' " (*Ybarra* v. *Illinois* (1979) 444 U.S. 85, 106 [62 L.Ed.2d 238, 255, 100 S.Ct. 338] (dis. opn of Rehnquist, J.), quoting *United States* v. *Oates* (2d Cir. 1977) 560 F.2d 45, 62.)[3] The danger is potentially at its greatest when, as here, the premises to be searched are a

---

[3]In *Ybarra* v. *Illinois*, *supra*, 444 U.S. 85 (hereafter *Ybarra*), the high court considered the application of *Terry* to the patdown search of a patron in a tavern being searched pursuant to warrant. The court rejected the argument *Terry* allowed a generalized search for weapons, where the officers had no individualized grounds for suspecting or fearing danger from the patron, who was not a target of the warranted search. *Terry*, the *Ybarra* court held, "does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked*, even though that person happens to be on premises where an authorized narcotics

private home, rather than a place of public accommodation as in *Ybarra*. "[B]ecause of the private nature of the surroundings and the recognized propensity of persons 'engaged in selling narcotics [to] frequently carry firearms to protect themselves from would-be robbers,' (*People* v. *Lee* (1987) 194 Cal.App.3d 975, 983 [240 Cal.Rptr. 32]) the likelihood that the occupants [of a residence] are armed or have ready accessibility to hidden weapons is conspicuously greater than in cases where, as in *Ybarra*, the public freely enters premises where legal business is transacted." (*People* v. *Thurman* (1989) 209 Cal.App.3d 817, 824-825 [257 Cal.Rptr. 517].) As the United States Supreme Court observed in *Maryland* v. *Buie* (1990) 494 U.S. 325 [108 L.Ed.2d 276, 110 S.Ct. 1093], involving the legality of a protective sweep during an in-home arrest, the dangers are particularly acute when an officer seeks to serve a warrant in a suspect's house. The officer is "at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." (*Id.* at p. 333 [108 L.Ed.2d at p. 285].)

■ The government interest in determining the identity of a person entering premises being searched is related to, though broader than, the officers' need for security. The risk posed by residents or familiars of the household, who may be involved in the criminal activities therein, is obviously greater than that posed by mere visitors who happen unwittingly on the scene. In addition, determining the identity and connection to the premises of a person who is already present on the search site, or who enters during the search, allows officers to ascertain whether the other interests identified in *Summers* warrant detention of the person during the search. The "legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found" (*Summers, supra,* 452 U.S. at p. 702 [69 L.Ed.2d at p. 349]), for example, is present only if there is reason to suspect the person of involvement in criminal activities on the premises. Similarly, only those with ownership, control or knowledge of the premises will be able to assist in the "orderly completion of the search." (*Id.* at p. 703 [69 L.Ed.2d at p. 350].) Searching officers therefore have a legitimate interest in determining the identity and connection of a person present at or entering a search site.

■ Having identified the relevant police interests, we weigh their application in this case against the invasion of defendant's personal security

---

search is taking place." (*Ybarra, supra,* 444 U.S. at p. 94 [62 L.Ed.2d at p. 247], italics added.) *Ybarra* is distinguishable from the present case as involving the question of grounds for *searching*, rather than *detaining*, an individual during execution of a search warrant, and by the public and commercial nature of the premises being searched. We find the present detention justified, in any event, by the particular circumstances under which it occurred, rather than by any generalized rule allowing detention of all those present at a search site.

involved in his initial detention, keeping always in mind that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry, supra,* 392 U.S. at p. 21 [20 L.Ed.2d at p. 906].) We look, that is, to "the nature of the articulable and individualized suspicion" justifying the detention. (*Summers, supra,* 452 U.S. at p. 703 [69 L.Ed.2d at p. 350].)

The officers, arriving after dark on a stormy night to execute a search warrant, saw defendant standing in an unlit spot in the driveway. Although investigator Murray was familiar with defendant, neither he nor any of the other officers recognized him under those conditions. Defendant was about to pass through a gate into the backyard of the house being searched. Defendant's apparent familiarity with the premises and his entry through the backyard suggested he was not a stranger or chance visitor, but his exact connection to the house was not immediately apparent. Determining the nature of that connection would allow the police to evaluate the applicability of the interests identified in *Summers,* that is, whether defendant would wish to be present to observe the search, whether he was likely to flee if contraband was discovered, and whether his presence would assist in orderly execution of the search. Defendant, moreover, was in the process of entering the premises and, if unimpeded, would come up behind the officers searching the house and outbuildings. Under these circumstances, Officer Hughes's decision to contact and identify defendant was not only reasonable, but virtually unavoidable.

According to defendant's own testimony, Hughes tried unsuccessfully to communicate with him for some time, perhaps as long as two minutes. The noise of the storm, and possibly some degree of disorientation from having just awakened, prevented defendant from understanding what Hughes was saying during this time. Hughes was thus faced with an unidentified person who appeared to be a resident or familiar visitor of a house in which, Hughes had probable cause to believe, criminal drug activity was occurring—a person who was standing where he could not be clearly seen under the prevailing conditions, who was unresponsive to verbal attempts at contact, and who, if left alone, would walk into the middle of a search being conducted by several other officers. Hughes had no practical choice but to detain defendant, and, under these circumstances, the means used—drawing his weapon and ordering defendant to the ground briefly for handcuffing— were not unreasonable. They are steps a "reasonably prudent" officer (*Terry, supra,* 392 U.S. at p. 27 [20 L.Ed.2d at p. 909]) could consider necessary to protect his own safety, that of the other searchers and that of the detainee himself.

No evidence was presented as to what inquiries, if any, Hughes made of defendant from the time defendant was successfully detained until Murray's

return and recognition of defendant, or what information Hughes acquired during that period. The period, however, was too brief—two minutes or less—to give rise to any implication Hughes unnecessarily prolonged the initial detention. As already discussed, the propriety of the officers' actions after Murray's return (including the further detention of defendant and the eventual search of his vehicle and person, which produced the evidence of possession) is not before us.

Defendant asserts he was "simply a visitor to the premises," and neither the holding nor the rationale of *Summers* is therefore applicable. We find this reasoning unpersuasive. *Summers*'s blanket rule allowing detention, it is true, applies only to "occupants" of a residence being searched. In its opinion, moreover, the high court also used the terms "residents" and "residence" to describe the detainee's connection to the premises (*Summers, supra,* 452 U.S. at pp. 701, 702, 704 [69 L.Ed.2d at pp. 348-349, 349-350, 350-351]), and some aspects of the court's rationale logically apply only to those with ownership, control or knowledge of the premises being searched. Noting these aspects of the opinion, Professor LaFave concludes "it would seem that the word 'occupants' is not to be loosely construed as covering anyone present, but instead is to be interpreted literally." (2 LaFave, Search and Seizure (2d ed. 1987) § 4.9(e), pp. 309-310, fns. omitted; but see *U.S.* v. *Fountain* (6th Cir. 1993) 2 F.3d 656, 663 ["occupants" as used in *Summers* not restricted to "residents"].)

That only occupant detentions fall within *Summers*'s safe harbor, however, does not imply nonoccupants may never be detained without probable cause during a search. (See 2 LaFave, Search and Seizure, *supra,* § 4.9(e), p. 311 [concluding *Summers* does not, "by negative implication, prohibit application of *Terry* to uphold a detention on reasonable suspicion, based on the facts of the particular case, of someone present where a search warrant is to be executed"]; accord, *State* v. *Torres* (1985) 197 Conn. 620 [500 A.2d 1299, 1301] [*Terry* applicable to nonoccupants]; *U.S.* v. *Reid* (D.C. Cir. 1993) 997 F.2d 1576, 1579 [302 App.D.C. 374] [detention reasonable even though defendant not within *Summers*'s "bright line" rule for occupants].)

As we have previously noted, when defendant was detained, he was in the process of entering the premises through a gate leading into the backyard. The officers who stopped him did not know who he was. Although investigator Murray eventually identified defendant as someone other than the house's owner, no evidence suggested even Murray knew whether defendant resided at the house or was merely visiting. While defendant may be correct he was not an occupant in the sense the *Summers* court used that term, the officers who detained him did not know that at the time. (See *U.S.* v.

*Jaramillo* (2d Cir. 1994) 25 F.3d 1146, 1152 ["it is obviously reasonable to believe that individuals in a private home or vehicle have some connection with one another"].) Defendant's apparent familiarity with the premises, together with the other circumstances detailed above, gave the officers grounds to suspect a connection sufficient, under all the circumstances, to justify a brief detention for the purposes of identification and protection of the officers' safety.[4]

Like the Court of Appeal, defendant relies heavily on *People* v. *Gallant*, *supra*, 225 Cal.App.3d 200 (hereafter *Gallant*). The defendant in that case was detained when he arrived at a private residence being searched. Police officers had already been in the house for more than 30 minutes and had found several baggies of what appeared to be methamphetamine. Defendant parked his automobile at the curb in front of the house, walked up to the front door and knocked. Nothing in his manner of approach was suspicious. An officer answered the door with gun drawn and ordered defendant inside, where he was detained and subjected to a patdown search. (*Id.* at pp. 203-204.)

---

[4]The "endless variations in the facts and circumstances" of detention cases (*Florida* v. *Royer, supra,* 460 U.S. at p. 506 [75 L.Ed.2d at p. 242]) make a complete comparison of cases difficult and perhaps less useful than in some other areas of the law. The treatment search-related detentions have received in decisions of many other state and federal courts, however, is consistent with that we employ here. (See, e.g., *People* v. *Huerta* (1990) 218 Cal.App.3d 744, 749 [267 Cal.Rptr. 243] [*Summers* authorizes detention of person who, without knocking or announcing his presence, entered residence where drugs and weapons had been found]; *U.S.* v. *Reid, supra,* 997 F.2d at pp. 1577-1579 [stop and frisk of man leaving apartment to be searched for narcotics held reasonable]; *U.S.* v. *Salazar* (2d Cir. 1991) 945 F.2d 47-51 [police conducting consent search of apartment could detain and pat down man who opened door and entered apartment unannounced and who matched description of person selling drugs from the apartment]; *United States* v. *Barlin* (2d Cir. 1982) 686 F.2d 81, 87 [approving detention of woman, unknown to the police, who arrived in the company of an apartment resident during search of apartment where drugs and guns were found]; *U.S.* v. *Fountain, supra,* 2 F.3d at p. 663 [man found in house being searched for narcotics and from which weapons had recently been seized could be handcuffed and made to lie on floor during search]; *U.S.* v. *Pace* (7th Cir. 1990) 898 F.2d 1218, 1238-1239 [*Summers* analysis justified detention of two men found in apartment to be searched for evidence of illegal gambling ]; *U.S.* v. *Moreno* (9th Cir. 1989) 891 F.2d 247, 249 [*Terry* permitted stop of woman who approached her house, in which police had found drugs and large amounts of cash, and then drove away when she saw police]; *People* v. *Martinez* (Colo. 1990) 801 P.2d 542, 543-544 [under *Terry*, officer who found drugs and guns in house could detain at gunpoint man who "was about to enter" the front door]; *State* v. *Torres, supra,* 500 A.2d at pp. 1300-1302 [man who entered apartment with resident during search in which cocaine was found could be detained briefly]; *Belvin* v. *State* (Fla.Dist.Ct.App. 1991) 585 So.2d 1103, 1104-1105 [officer arriving to search residence for drugs could detain man who fled from outside of house at officer's approach]; *State* v. *Gobely* (Minn. 1985) 366 N.W.2d 600, 602 [officers who found stolen goods in apartment and knew others besides occupants had participated in the thefts could detain person who entered apartment in familiar way, "was obviously acquainted with the occupants," and refused to identify himself when asked].)

The appellate court held the detention illegal because of the absence of specific and articulable facts linking the defendant to the criminal activities in the residence. "In the absence of evidence of their particular involvement in the illegal activity, friends, family and the Fuller Brush man should be free to knock on the door without being ordered inside at gunpoint and frisked." (*Gallant, supra,* 225 Cal.App.3d at p. 208.) *Summers* was inapplicable, the court held, because "defendant was not an occupant, as demonstrated to the officers when he knocked on the door instead of opening it himself. Furthermore, the officers knew that the male member of the household had recently died." (*Id.* at pp. 208-209.) While the police were free to question defendant "to ascertain his connection to the premises, they cannot detain him to do so unless they have specific, articulable facts indicating such a connection." (*Id.* at p. 210.)

*Gallant* is clearly distinguishable. Unlike Mr. Gallant, and presumably unlike the Fuller Brush man, defendant did not walk up to the front door and knock. Rather, he was on the point of entering the premises, apparently without seeking permission from the residents, through a backyard gate. Unlike the officers in *Gallant,* Officer Hughes could not immediately identify defendant as a *non*resident. Defendant arrived, moreover, simultaneously with the beginning of the search, rather than after the premises had long been secured, as in *Gallant.* His nonresponsive manner made questioning him as to his identity and connection to the house difficult. The darkness, the storm, and defendant's demonstrated intent to enter the yard created a danger of harm to him and the searching officers if he were allowed to proceed unimpeded. These specific and articulable facts, not present in *Gallant,* gave the officers here grounds to suspect defendant was more than a chance visitor and to fear harm if he was not contacted and secured in some manner.[5]

In the trial court, defendant argued the police, instead of detaining him, should have simply told him the house was being searched and ordered him

[5]The other decisions cited by defendant are similarly distinguishable. At issue in *United States* v. *Cole* (5th Cir. 1980) 628 F.2d 897 was the validity of a patdown *search,* rather than a detention. Relying on *Ybarra,* the appellate court held the frisk could not be justified by the defendant's mere presence in the carport of the residence to be searched, without any specific articulable facts indicating the defendant was dangerous. (*United States* v. *Cole, supra,* 628 F.2d at p. 899; see also *U.S.* v. *Harvey* (5th Cir. 1990) 897 F.2d 1300, 1304, fn. 2, overruled on other grounds, *U.S.* v. *Lambert* (5th Cir. 1993) 984 F.2d 658, 662 [distinguishing *Cole* where facts beyond mere presence gave officer grounds to suspect defendant was armed].) *United States* v. *Ward* (10th Cir. 1982) 682 F.2d 876, 880-881 likewise involved the validity of a frisk, rather than a detention, and rested on the absence of reasonable suspicion the defendant was dangerous. (See also *State* v. *Broadnax* (1982) 98 Wn.2d 289 [654 P.2d 96, 103-104] [person's "mere presence" at search site does not justify detention or search]; *Lippert* v. *State* (Tex.Crim. 1984) 664 S.W.2d 712, 720-721 [presence at time of search coupled with officer's prior observation of defendant at residence insufficient to justify patdown search].)

to "buzz off." The circumstances here, however, did not lend themselves to such an easy solution. Defendant's unresponsiveness made inquiry without detention difficult or impossible; the officers, who had reason to suspect he was more than a chance visitor, therefore did not act unreasonably in detaining defendant rather than simply warning him off.

A complete stranger to the premises arriving during the search might, under many circumstances, be sent on his or her way with little fear of danger to the officers conducting the search. In contrast, a resident or intimate of the home, who may have criminal interests there to protect, may present a substantial risk even if he or she leaves when encountered by the police. The police are not required to ignore the danger that persons possibly involved in crime, who leave the premises, may return during the search, with potentially fatal consequences for themselves or the officers. (See *U.S.* v. *Reid*, *supra*, 997 F.2d at p. 1579 [search of person encountered leaving apartment to be searched justified by officer's testimony "he felt endangered by Reid's potential presence behind the officers as they were seeking to execute the search warrant"]; *U.S.* v. *El-Gabrowny* (S.D.N.Y. 1994) 876 F.Supp. 495, 499 [detention permissible of person who left building about to be searched, then started to return, where "if permitted to continue unhindered, he would come up behind agents who were about to execute a search warrant"].) Even assuming, therefore, that under some circumstances the police might act unreasonably in detaining a person arriving at a search site, without giving the person an opportunity to disavow a connection to the premises and leave (see, e.g., *United States* v. *Clay* (8th Cir. 1981) 640 F.2d 157, 161), in the present circumstances the decision to detain defendant was not an unreasonable one.

Innocent explanations for defendant's entry onto the property could certainly have been imagined and may have been as likely as those suggesting risk and suspicion. ██ As we have recently reiterated, however, that a person's conduct is consistent with innocent behavior does not necessarily defeat the existence of reasonable cause to detain. (*People* v. *Souza*, *supra*, 9 Cal.4th at pp. 233-235.) What is required is not the *absence* of innocent explanation, but the *existence* of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry*, *supra*, 392 U.S. at p. 21 [20 L.Ed.2d at p. 906].) As we have seen, the present detention was objectively justifiable on that standard.

III

 The People urge as a general rule that when police have a warrant to search a home, "the mere arrival or presence of someone at the warranted

premises, by itself," justifies a detention for the purpose of determining identity and connection to the searched premises. We decline to adopt the proposed rule. Such a blanket approval of detentions in the course of searches would present too great a danger "of slippage into a guilt by association pattern whereby anyone seen near prospective drug activity becomes fair game for a stop and frisk." (*U.S.* v. *Reid*, *supra*, 997 F.2d at p. 1579.) Nonetheless, we believe it possible, consistent with *Terry* and *Summers*, to outline a more limited rule of some generality for the guidance of the police and the lower courts.

When, in the course of initiating a search under warrant of a private residence for illegal drugs or related items, police officers encounter on the premises a person whose identity and connection to the premises are unknown and cannot immediately be determined without detaining the person, the officers may constitutionally detain him or her for the period of time required and in the manner necessary to make those determinations and to protect the safety of all present during the detention. If the person is determined to be an occupant of the home to be searched, he or she may be detained, pursuant to *Summers*, for the duration of the search. (*Summers*, *supra*, 452 U.S. at p. 705 [69 L.Ed.2d at p. 351].) If the person is determined not to be an occupant, further detention is proper only if justified by other specific, articulable facts connecting him or her to the criminal activity suspected to be occurring on the premises or establishing a danger to the officers if the person is released.

In the unstable situation presented at the onset of a search of a private home for narcotics, the searching officers need to locate and identify all persons on the premises. That step is essential to protecting each of the three interests identified in *Summers*, *supra*, 452 U.S. at pages 702-703 [69 L.Ed.2d at pages 349-350]: ensuring the safety of the officers and others present, preventing flight of residents involved in the suspected criminal activity, and facilitating orderly completion of the search. In many instances the identity and resident or nonresident status of a person encountered as the search is beginning are not immediately apparent to the searching officers, and cannot safely be determined without momentarily restricting the person's freedom of movement. As the *Summers* court noted, in such ambiguous and fluid circumstances the risk of violence is minimized if the police exercise complete command of the search site. (*Ibid.*)

Under *Terry* the touchstone of reasonableness for search or seizure without probable cause is the presence of "specific and articulable facts" that reasonably warrant the intrusion on personal liberty and privacy. (*Terry*, *supra*, 392 U.S. at p. 21 [20 L.Ed.2d at pp. 905-906].) The existence of a

warrant to search a home for illegal drugs, the presence of an unknown person on the premises when police begin the search, and the officer's inability to immediately determine the person's identity and connection to the premises without effecting a detention, are specific and articulable facts that, on balance, reasonably warrant a detention limited to the time and means needed to resolve the questions of identity and occupancy and to protect the safety of those present while those questions are resolved.

## CONCLUSION

The circumstances in which the police officers encountered defendant at the residence to be searched gave them sufficient grounds to detain him briefly for the purposes of identification and protection of the officers' safety. The Court of Appeal erroneously held the initial detention illegal and did not decide the remaining questions raised by the suppression motion. The judgment of the Court of Appeal is therefore reversed, and the cause is remanded to that court for further proceedings consistent with our opinion.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.