Filed 8/28/14  P. v. Morrison CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SHAUNTINA MARIA MORRISON,<br><br>    Defendant and Appellant. | F067257<br><br>(Super. Ct. No. BF140836A)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Louis P. Etcheverry and J. Eric Bradshaw, Judges.[†]

Tutti Hacking, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, R. Todd Marshall and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Cornell, Acting P.J., Gomes, J. and Poochigian, J.

[†]    Judge Etcheverry presided over the combined preliminary hearing and motion to suppress hearing.  Judge Bradshaw presided over the renewed suppression hearing.

Appellant, Shauntina Maria Morrison, was charged with felony possession of heroin (Health & Saf. Code, § 11350, subd. (a)) and possession of narcotics paraphernalia (Health & Saf. Code, § 11364.1). In addition, it was alleged she had suffered a "strike."[1] Appellant moved to suppress evidence (Pen. Code, § 1538.5) and the court, at a hearing on that motion combined with the preliminary hearing, summarily denied the motion. Subsequently, appellant renewed her suppression motion, submitted the motion on the preliminary hearing transcript, and the court, by minute order, summarily denied the renewed motion.

Thereafter, pursuant to a plea agreement, appellant pleaded no contest to both charges and admitted the strike allegation. The court struck the strike and admitted appellant to Proposition 36 drug treatment probation, i.e., probation under the Substance Abuse and Crime Prevention Act of 2000 (Pen. Code, § 1210 et seq.).

On appeal, appellant's sole contention is that the court erred in denying her suppression motion. We will reverse.

## FACTS

At approximately 10:55 a.m., on February 24, 2012, Bakersfield Police Officer Eric Littlefield, four other police officers and Probation Officers Crawford[2] and Gregory Bittle arrived at a house (the house) in Kern County to conduct a "probation compliance search" of Rodger Stugard.[3] Littlefield and the other officers parked "several residences" away from the house and as they walked toward it, Littlefield saw appellant and Stugard "exiting [the] yard of the [house] and getting into a vehicle." Stugard began to drive off,

---

[1]    We use the term "strike," in its noun form, as a synonym for "prior felony conviction" within the meaning of the "three strikes" law (Pen. Code, §§ 667, subds. (b)-(i); 1170.12), i.e., a prior felony conviction or juvenile adjudication that subjects a defendant to the increased punishment specified in the three strikes law.

[2]    Probation Officer Crawford's first name does not appear in the appellate record.

[3]    Except as otherwise indicated, our factual summary is taken from Officer Littlefield's testimony.

at which point, Littlefield "ran up to the car" and "start[ed] banging on the back of the car," "yelling 'stop the car.'" The car stopped approximately "two houses away" from the house. Littlefield directed appellant to get out of the car, and appellant did so. At that point, Officer Crawford conducted a patsearch of appellant. No contraband or weapons were found.

At some point thereafter, Littlefield walked appellant to the house, where Littlefield stood in the doorway while appellant, at Littlefield's request, went inside and "wrangled the numerous dogs into bedrooms and garages" so that officers could safely enter the house.

Officer Bittle testified to the following. He participated in a "protective sweep" of the house, and after determining there was no one inside, he came back outside and spoke to appellant, who was standing in the front yard. Officer Crawford was standing nearby. Bittle asked appellant which room belonged to Stugard. Appellant told Bittle "it was the northeastern bedroom." Bittle then asked appellant if there was anything in the house that could harm him. Appellant responded there was a "loaded syringe" located in a box, in a nightstand. This exchange occurred approximately five to 10 minutes after the stop of the car. After talking to appellant, Bittle reentered the house, searched the room appellant had indicated and found a syringe "with a brown liquid substance in it," located in a box, in a nightstand.

It was stipulated at the hearing that the substance inside the syringe was heroin, in a usable amount.

After observing the syringe Bittle had found, Officer Littlefield "advise[d] [appellant] of her rights under Miranda."[4] Thereafter, appellant stated the syringe and heroin belonged to her. At least 10 minutes elapsed from the time the car was stopped to the time Littlefield "Mirandiz[ed]" appellant. At some point, Littlefield learned from

---

[4] See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

both appellant and Stugard that the two shared the bedroom in which the syringe was found.

## DISCUSSION

"The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees the right to be free of unreasonable searches and seizures." (*People v. Gallegos* (2002) 96 Cal.App.4th 612, 622.) A "brief investigative stop[]" of a person, commonly referred to in the case law as a detention, is a seizure within the meaning of the Fourth Amendment. (*People v. Souza* (1994) 9 Cal.4th 224, 229.) Appellant argues that the incriminating evidence obtained by the officers, including the syringe containing heroin found in the house and appellant's admissions after the syringe was found, were the products of a constitutionally unreasonable detention and therefore should have been suppressed. The People do not dispute appellant was subject to a seizure for Fourth Amendment purposes from the time she was directed to get out of the car, but they argue that the detention was not constitutionally unreasonable because the length of the detention was "minimal," the scope of the search of the house was limited to determining whether Stugard was in compliance with the terms of his probation, there was "no evidence of an independent investigatory purpose or motive focusing on appellant," appellant's identity and her connection to the house could not be immediately determined, and the detention was appropriate "once it was learned" appellant lived in the house with Stugard.

Our analysis begins with *Michigan v. Summers* (1981) 452 U.S. 692 (*Summers*). In that case, police officers executing a search warrant at a house encountered the defendant leaving the house. The officers detained the defendant while they searched the house, and during the search they found drugs. Upon learning the defendant owned the house, police arrested him, searched his person and found heroin in his pocket. The defendant moved to suppress the heroin, and the trial court denied the motion. The Supreme Court upheld the denial of the suppression motion.

4

The "dispositive question" was the legality of the detention. (*Summers*, *supra*, 452 U.S. at p. 694.) The court recognized the detention was a seizure for Fourth Amendment purposes and that at the outset of the detention the police lacked probable cause to arrest the defendant. However, the court concluded: "[S]ome seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." (*Summers*, at p. 699.) Whether any given seizure can be justified under this less-than-probable-cause standard depends on the "character of the official intrusion and its justification," and a significant factor in evaluating the character of the intrusion in *Summers* was that it was pursuant to a search warrant, i.e., a neutral magistrate had concluded there was probable cause to believe that the law was being violated in the house. (*Id*. at p. 701.) "The connection of an occupant to [a house being searched pursuant to a search warrant] gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." (*Id*. at pp. 703-704, fn. omitted.) "Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (*Id*. at p. 705, fns. omitted.)

In *People v. Glaser* (1995) 11 Cal.4th 354 (*Glaser*), the California Supreme Court applied the principles enunciated in *Summers* to another case involving the detention of an individual during the execution of a search warrant. In *Glaser*, about 20 seconds after the defendant arrived at a house and was opening the gate to the property, police officers arrived to search the house pursuant to a search warrant. The officers detained the defendant while one of their number went inside to help secure the interior of the house, and then returned to the area outside where the defendant was being detained. The issue before the court was the legality of that initial detention.

5

Our Supreme Court found the detention was "justified by the need to determine [the] defendant's identity and connection to the premises and to protect the officers' own safety." (*Glaser*, *supra*, 11 Cal.4th at p. 360.) The court balanced "the extent of the intrusion against the government interests justifying it, looking in the final and dispositive portion of the analysis to the individualized and objective facts that made those interests applicable in the circumstances of the particular detention." (*Id*. at p. 365.) After applying this test, the court found "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. [Citation.]" (*Id*. at p. 373.) Specifically, the court stated: "The existence of a warrant to search a home for illegal drugs, the presence of an unknown person on the premises when police begin the search, and the officer's inability to immediately determine the person's identity and connection to the premises without effecting a detention, are specific and articulable facts that, on balance, reasonably warrant a detention limited to the time and means needed to resolve the questions of identity and occupancy and to protect the safety of those present while those questions are resolved." (*Id*. at pp. 374-375.)

This court relied in large part on *Summers* and *Glaser* in *People v. Hannah* (1996) 51 Cal.App.4th 1335 (*Hannah*) in upholding the validity of a detention in a case in which a search warrant was not involved. In *Hannah*, police officers, looking for a juvenile with an outstanding arrest warrant, went to an apartment and, with the consent of the woman who answered the door, entered and saw the defendant and another man in the living room. The officers directed the two men to remain seated, and one of the officers searched the apartment in an effort to determine if the defendant was present and if there were any weapons in apartment, while two other officers remained in the living room. Shortly thereafter, upon noticing the defendant's eyes were dilated and, suspecting the defendant was under the influence, officers arrested the defendant.

Citing *Glaser* and *Summers*, the court noted, "Because a *search* warrant establishes there is probable cause to believe that criminal activity is being conducted at a

6

given location, it adds additional credence to the need to detain an individual found there to protect the safety of the officers involved in the search." (*Hannah, supra*, 51 Cal.App.4th at p. 1345, italics added.) However, the court stated the existence of a search warrant "is but one factor" for a court to consider in determining "the governmental interest involved" in a detention. (*Id.* at p. 1343.)

In *People v. Matelski* (2000) 82 Cal.App.4th 837 (*Matelski*), the court applied *Summers*, *Glaser* and *Hannah* to the same situation presented by the instant case, viz., a detention in the context of a probation search of a third party. Police officers went to a home to conduct a probation search of a person named Michael Mitchell. The officers were "prompted by the fact" that Mitchell had failed a drug test. (*Matelski*, at p. 841.) As the police were arriving, the two defendants, Mr. and Ms. Matelski, were walking out the front door. One of the officers directed the defendants to "'Come over here.'" (*Ibid*.) The officers "explained to the defendants that a condition of Mr. Mitchell's parole [*sic*] prevented him from associating with persons who were convicted felons." (*Ibid*.) The officer then asked them for identifying information in order to determine if they were convicted felons. Subsequently, a warrant check revealed that both of the defendants had outstanding arrest warrants, and officers arrested them, searched them, and found methamphetamine and marijuana pipes in Ms. Matelski's purse.

In a two-to-one decision, the majority held the detention and subsequent search did not violate the defendants' Fourth Amendment rights. The officer's questioning of the defendants to ascertain their identity was justified, in part, because although there was no need to determine the defendants' connection to the premises, as in the cases involving search warrants, "there was a need to determine [the] defendants' connection to the probationer because the probationer was prohibited by his general terms of probation from consorting with convicted felons." (*Matelski, supra*, 82 Cal.App.4th at p. 850.) The majority concluded: "The officers simply had no other way to enforce the probation term that Mr. Mitchell not associate with known felons unless they could identify his

7

associates and determine whether they were known felons or not.  They did so in a minimally intrusive manner, and we find that the intrusion did not violate the privacy rights of [the] defendants.  Thus, if we balance the privacy interests of the defendants, who were associating with the probationer, against the governmental interests in enforcing a valid term of probation, we find that the governmental interests outweighed the brief and minimally intrusive detention of the defendants for the purpose of learning their identity in order to determine if they were known felons."  (*Id*. at pp. 852-853.)

In addition, the majority "emphasize[d] that this was not a suspicionless intrusion."  (*Matelski*, *supra*, 82 Cal.App.4th at p. 851.)  "[T]he officers were not acting randomly."  (*Id.* at p. 853.)  "Instead, the officers were at the residence to enforce probation terms against Mr. Mitchell because he had flunked a drug test."  (*Id*. at p. 852.)

*People v. Rios* (2011) 193 Cal.App.4th 584 (*Rios*) also dealt with a detention in the context of a probation search.  In that case, on July 14, 2007 (July 14), six officers went to the home of juvenile probationer R.R.  The officers were "aware that the conditions of R.R.'s probation included orders to not associate with gang members, and search terms."  (*Id*. at p. 589.)  In addition, some two months earlier, during a home visit by officers, R.R. had admitted being under the influence of methamphetamine, and officers found drug paraphernalia and gang tagging in the house.  When officers entered the home on July 14, with permission, the defendant Rios was sitting on a couch near the front door.  Officers asked Rios questions, including his name and address, and Rios repeatedly answered that "he was not doing anything."  (*Ibid*.)  One of the officers noticed Rios had gang tattoos.  Shortly thereafter, Rios moved his body in such a way as to make it appear he was reaching for a weapon.  After refusing the officers' requests to stand up, an officer grabbed Rios's wrist and after a struggle, a gun fell out of the front of Rios's shirt area.

This court assumed Rios was detained from the time of the officers entry, and found the detention constitutionally reasonable.  After discussing *Summers*, *Glaser*,

8

*Hannah* and *Matelski*, this court reasoned: "In our view, *Matelski* is factually similar and legally persuasive. Although the probation officers in Rios's case had no arrest or search warrant, they were conducting a valid home visit to a probationer who had violated his probation in the recent past. They had the right to enter and search for him, he was subject to gang and drug conditions, and Rios had what reasonably appeared to be visible gang tattoos on his face and hand. Under the circumstances, they could briefly detain him to ascertain his identity and relationship to the probationer and the probationer's residence." (*Rios*, *supra*, 193 Cal.App.4th at p. 595.)

As the foregoing authorities make clear, our task is to balance "the extent of the intrusion against the government interests justifying it." (*Glaser*, *supra*, 11 Cal.4th at p. 365.) "Where, as here, a motion to suppress is submitted to the superior court on the preliminary hearing transcript, 'the appellate court disregards the findings of the superior court and reviews the determination of the magistrate who ruled on the motion to suppress, drawing all presumptions in favor of the factual determinations of the magistrate, upholding the magistrate's express or implied findings if they are supported by substantial evidence, and measuring the facts as found by the trier against the constitutional standard of reasonableness.' [Citation.] 'We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment. [Citation.]' [Citation.]" (*People v. Hua* (2008) 158 Cal.App.4th 1027, 1033.)

We agree with the People that the intrusion in the instant case was minimal. It was relatively brief, and involved virtually no show of official force. (See *Hannah*, *supra*, 51 Cal.App.4th at p. 1344 [in finding detainee was subjected to minimal intrusion, relevant factors included no handcuffing or police display of weapons, and detention was "at most, several minutes"].)

We find *Matelski* and *Rios* particularly instructive on the extent-of-intrusion issue. In each case, as indicated above, the court found that the detention of an individual as

police were attempting to conduct a probation search was justified by the government interest in conducting such a search, even though, as in the instant case, there was nothing to indicate that the person detained was violating the law. There were, however, other factors present in *Matelski* and *Rios* that were not present in the instant case.

The *Matelski* court stated "there was a need to determine [the] defendants' connection to the probationer *because the probationer was prohibited by his general terms of probation from consorting with convicted felons*." (*Matelski*, *supra*, 82 Cal.App.4th at p. 850, italics added.) Thus, the record contained a specific, articulable fact that reasonably warranted the intrusion—the existence of a certain probation condition. By detaining the Matelskis and questioning them as to their criminal history, the police might obtain information establishing a probation violation. Thus, the detention served the important law enforcement interest of assisting the police in determining if the probationer was in violation of the terms of his probation. And as the court explained, questioning the defendants was the only way to accomplish this important function.

*Rios* is similar. A term of probation prohibited the probationer from associating with gang members and the defendant, sitting in the living room of the probationer's home, had visible gang tattoos. Because of the gang association condition of probation and the evidence the defendant had some gang connection, detaining the defendant to question him was justified by the police interest in determining whether the probationer had violated his probation.

In the instant case, by contrast with both *Matelski* and *Rios*, there is nothing in the record to indicate the existence of a probation condition or any other basis upon which the police could have formed a suspicion that appellant had information she could have provided the officers that would have enabled the officers to enforce the terms of Stugard's probation.

In addition, the probation search in *Matelski* was "prompted" (*Matelski*, *supra*, 82 Cal.App.4th at p. 841) by the fact that the probationer had recently failed a drug test, and for this reason, the court "emphasize[d]" (*id*. at pp. 851, 853), police had a suspicion founded on articulable facts that the probationer could be in violation of probation. "[T]he officers were at the residence to enforce probation terms against Mr. Mitchell *because he had flunked a drug test*." (*Id*. at p. 852, italics added.) Similarly, in *Rios*, the search was not suspicionless, in that police were aware the probationer had recently violated his probation.

Here, there is nothing in the record to suggest that the officers, in conducting a "probation compliance search," were acting on facts that might give rise to a suspicion that Stugard was in violation of probation. Insofar as the record reveals, the police, in the language utilized in *Matelski*, were "acting randomly." (*Mateleski, supra,* 82 Cal.App.4th at p. 853.)[5]

The authorities we have discussed here establish the following. A brief investigative detention on less than probable cause may be justified "so long as police have an articulable basis for suspecting criminal activity." (*Summers*, *supra*, 452 U.S. at p. 699.) In some cases, like *Summers* and *Glaser*, the existence of a search warrant provides the requisite basis for suspecting criminal activity. In the only two probation search cases cited and discussed by the parties—and we are not aware of any others—other factors perform that function.

None of these factors is present in the instant case. Here, there was no search warrant, no evidence appellant was in violation of the law, and no evidence there was any

---

[5] In the opposition to defendant's renewed suppression motion, the prosecutor raised the additional theory of the independent source doctrine based on the supposition that the search of the house was otherwise valid because of Stugard's probationary status. However, this theory was not factually supported because the prosecutor had failed to introduce any evidence at the preliminary hearing of Stugard's prior conviction, the terms and conditions of his probation, whether he was subject to a search condition, or the nature and extent of a search condition. Thus, we need not address this issue on appeal.

criminal activity in progress. There was also no evidence, such as evidence of recent probation violation, indicating Stugard might be in violation of probation. And there was no evidence, such as the gang tattoos in *Rios* or the existence of a no-association-with-felons parole term in *Matelski*, that suggested that detaining and questioning appellant might lead to the discovery of a probation violation or any other wrongdoing.

We recognize law enforcement has a legitimate interest in conducting probation searches to monitor compliance with probation terms, regardless of whether the police have reason to believe the probationer is actually in violation of those terms, and we further recognize that the intrusion on appellant's privacy rights was minimal. However, in our view, these factors did not justify the intrusion on appellant's Fourth Amendment protected interests that occurred here by virtue of the detention, in the absence of any articulable facts (1) from which it could be inferred that the police had reason to believe the probationer might be in violation of probation or the detention was necessary to obtain from appellant information that would establish a probation violation, or (2) that in some other way gave rise to a reasonable suspicion that some criminal activity was afoot. Thus, the detention was unlawful, and the incriminating evidence obtained by the officers, including the contraband found in the house and appellant's statements to police, should have been suppressed as the products of the unlawful detention. (*United States v. Crews* (1980) 445 U.S. 463, 470.) The trial court therefore erred in denying appellant's suppression motion.[6]

---

[6] Appellant makes the following arguments: The detention was unlawful because the patsearch of appellant was unlawful; her incriminating statements, which led to the seizure of the syringe and heroin, were not preceded by *Miranda* advisements; the protective sweep of the house was unlawful; and the search of the house cannot be justified as a valid probation search. Because we reverse on the grounds discussed above, we need not address these contentions.

## DISPOSITION

The judgment is reversed. The cause is remanded to the trial court with directions to grant appellant's Penal Code section 1538.5 motion, and vacate appellant's no contest pleas and admission of the strike allegation, if appellant makes an appropriate motion within 30 days of the issuance of the court's remittitur. If no such motion is made, the trial court shall reinstate the judgment.