Filed 12/4/13  P. .v Williams CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>AMANDA RAE WILLIAMS et al.,<br><br>  Defendants and Appellants. | H037936<br>(Santa Clara County<br>Super. Ct. No. C1109707) |

Defendants Amanda Rae Williams and Duane Lionel Chavez pleaded guilty to child endangerment (Pen. Code, § 273a, subd. (a)), possession of heroin (Health & Saf. Code, § 11350, subd. (a)), possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), and being under the influence of heroin (Health & Saf. Code, § 11550, subd. (a)).  The trial court suspended imposition of sentence and placed defendants on probation for four years on condition, among other things, that they serve one year in county jail.  On appeal, defendants contend that the trial court erred in denying their motions to suppress evidence.  We disagree and affirm the orders.

## I.  Statement of Facts[1]

Officer Tom Tiphayachan testified that at about 10:00 a.m. on June 19, 2011, he and Officers Catherine Velasquez and Noreen Marinelli were dispatched to 1368 Essex Way in San Jose in response to a report of a "verbal disturbance" between a male and a female.  Tiphayachan spoke with the reporting party who told him that the disturbance occurred on the second floor of the apartment building at 1376 Essex Way.  However, the reporting party was unable to pinpoint which of the two apartments on the second floor was the scene of the disturbance.

The three officers went to the second floor of the apartment building, but they did not hear anything.  Tiphayachan then knocked loudly a few times on one of the doors.  After 20 to 30 seconds, Williams answered the door.  Tiphayachan explained that they were investigating a disturbance between a male and a female and asked her if she knew about the disturbance or was involved in it.  Williams appeared "very apprehensive" and, after a long pause, she replied that she was not involved.  When he again asked whether she knew about any disturbance, she eventually pointed downstairs.  After about 25 seconds of speaking to Williams, Tiphayachan concluded that she was under the influence of heroin because she had droopy eyelids, "sounded very lethargic," and had several intravenous drug marks on her arms and neck.[2]  When he asked her if anyone else was in the apartment, she replied that her husband and four-year-old child were inside.

Tiphayachan became very concerned about the child's well-being.  Based on his experience that intravenous drug users often had additional narcotics and uncapped or "loaded" hypodermic needles, he was concerned that the child would have access to these items.  At this point, he wanted to check on the child's welfare first and then "deal with"

---

[1]    The statement of facts is based on the evidence introduced at the hearing on the motion to suppress evidence.

[2]    Tiphayachan testified as an expert in recognizing the physiological symptoms of a person under the influence of heroin as well as methamphetamine, how those substances are ingested, and the paraphernalia associated with heroin and methamphetamine use.

2

Williams at a later time. Though the officer had decided to enter the apartment, he asked Williams if he could check inside to ensure that no fight had occurred and to check on the welfare of her child and husband. According to Tiphayachan, Williams did not reply, stepped backwards, and opened the door slightly.[3] When Tiphayachan asked Williams where her husband and child were, she replied that they were in the back bedroom.

Tiphayachan and Marinelli entered the apartment. Tiphayachan passed by some open doors, went to the bedroom at the end of the hallway, knocked several times on the closed door, and announced himself as a police officer. After about 35 to 45 seconds, Chavez answered the door. Chavez was "extremely lethargic," his eyes were "droopy," and his pupils were constricted. He spoke in a "very slow, raspy tone of voice" and had numerous marks on his body that indicated intravenous drug use. In Tiphayachan's opinion, Chavez was under the influence of an opiate. The officer asked him why it took so long to answer the door, and he answered that he was using the restroom. When Tiphayachan asked him where the child was, Chavez pointed to the child, who was sitting in front of a computer in the bedroom. The child was wearing a T-shirt, but he was not wearing pants. Codefendant William Lindley was lying on the bed. Tiphayachan asked Lindley and Chavez to exit the bedroom so he could check on the child's welfare. The child appeared to be fine.

When the officers directed Chavez and Lindley into the living room, the child followed them. Tiphayachan concluded that Lindley was under the influence of heroin and "possibly" under the influence of methamphetamine. He had marks on his body indicating intravenous drug use, his speech was very rapid, and he had a dry mouth. Lindley was placed under arrest for being under the influence of a controlled substance.

---

[3]    Defendants challenged Tiphayachan's version of events regarding Williams' implied consent. A surveillance video, which did not have sound, showed Williams speaking with the officers. However, the trial court did not determine whether Williams consented to the request to enter the apartment.

Velasquez testified that she had remained with Williams when the other two officers entered the apartment. In her opinion, Williams was under the influence of heroin.[4] When Velasquez brought Williams into the living room, she overheard Lindley admit to using needles. She then asked him directly where the needles were. He replied that they were in the bedroom but he would not give an exact location. Though Chavez told Velasquez that the child was not near the needles, no one knew where the child was at that point.

Velasquez saw that the door to the back bedroom was closed and when she tried to open it, it was locked. She saw a key above the door and opened the door. The child was again sitting in front of the computer and there was nothing hazardous near him. However, when she stooped down to pick up his underwear to help him get dressed, she noticed that the bathroom door was open and there appeared to be blood on the floor. She entered the bathroom and saw blood in the sink area, a butane lighter, a glass pipe, and other drug paraphernalia. Velasquez also saw a hypodermic needle inside the vanity cabinet because the doors to the cabinet were open. The hypodermic needle contained a brownish substance which the officer believed to be heroin. The child would have been able to reach any of these items. Velasquez returned to the living room and told Marinelli what she had found. Marinelli then arrested Williams and Chavez for possession of controlled substances and child endangerment.

Though the trial court declined to make a finding on whether Williams had consented to a search of the apartment, it denied the suppression motion. The trial court noted that Tiphayachan had testified that Williams appeared to be under the influence of heroin and told him that her four-year-old child was in the apartment with his father. The trial court found that the officers properly entered the residence to determine "whether

---

[4] Velasquez testified as an expert in recognizing persons under the influence of heroin and the paraphernalia associated with the use of heroin.

there was a responsible adult with that four-year-old child before they arrested the four-year-old child's mother and went away."

## II. Discussion

Defendants contend that the trial court erred in denying their motions to suppress evidence. They contend that entry into defendants' residence was unlawful because Williams did not give her consent and there were no exigent circumstances.

"'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]'" (*People v. Weaver* (2001) 26 Cal.4th 876, 924, quoting *People v. Glaser* (1995) 11 Cal.4th 354, 362.)

The federal and state Constitutions prohibit unreasonable searches and seizures by the government. (U.S. Const., 4th & 14th Amends.; Cal. Const., art. 1, § 13.) A warrantless entry into a home is presumptively unreasonable. (*Payton v. New York* (1980) 445 U.S. 573, 587.) In the case of a warrantless search of a home, the prosecution bears the burden of establishing that the search "was justified by some exception to the warrant requirement." (*People v. Camacho* (2000) 23 Cal.4th 824, 830.) One exception to the warrant requirement is "the need to assist persons who are seriously injured or threatened with such injury. '"The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."' [Citations.] Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. [Citations.]" (*Brigham City v. Stuart* (2006) 547 U.S. 398, 404.) "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. [Citation.] It

5

requires only 'an objectively reasonable basis for believing,' [citation], that 'a person within [the house] is in need of immediate aid.' [Citation.]" (*Michigan v. Fisher* (2009) 558 U.S. 45, 47 (*Fisher*).) "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." (*Id.* at p. 49.)

*U.S. v. Bradley* (9th Cir. 2003) 321 F.3d 1212 (*Bradley*) is instructive. In *Bradley*, the police officers stopped the defendant while he was driving with his girlfriend at 1:00 a.m., and they arrested them for possession of methamphetamine. (*Id.* at p. 1213.) Based on a prior incident involving the defendant, one of the officers asked the defendant's girlfriend, who also lived with the defendant, where her nine-year-old son was. (*Ibid.*) She replied that he was home with a friend. (*Ibid.*) However, no one responded to the officers' knocking on the door to their residence. (*Id.* at p. 1214.) The officer then asked her again where her son was, and she replied that he was with a neighbor. (*Ibid.*) When the neighbor did not know where the child was, the officers opened an unlocked back door to the residence, announced themselves, and entered the residence. (*Ibid.*) The child then came out of a front room. (*Ibid.*) While an officer escorted the child to his bedroom to get dressed, the officer observed hypodermic needles and a cash register belonging to a gun store. (*Ibid.*) *Bradley* held that the emergency aid doctrine justified the officers' entry into the residence. (*Id.* at p. 1215.)

Similarly, here, the officers acted reasonably under the circumstances. The officers were responding to a report of a disturbance between a man and a woman on the floor where defendants lived. While speaking with the officers, Williams was "very apprehensive" and evasive about her knowledge of the disturbance. Tiphayachan concluded that she was under the influence of heroin based on her demeanor and the intravenous drug marks on her arms and neck, and thus he had probable cause to arrest her. He then learned that her husband and four-year-old child were also in the apartment. Based on his experience and training, the officer was concerned that drugs and needles

6

posed a danger to this very young child. Thus, the officers entered the apartment to avoid serious injury to the child.

Relying on *People v. Brown* (1989) 210 Cal.App.3d 849 (*Brown*), Chavez argues that the warrantless entry cannot be justified by Tiphayachan's belief that Williams was under the influence of heroin. *Brown* is inapposite. In that case, the police received a tip that drug trafficking was occurring in an apartment. (*Id.* at p. 853.) While the officers were speaking to the tenant of the apartment, a woman, who was under the influence of a stimulant, left a back bedroom. (*Ibid.*) After the officers arrested the woman, the tenant told them that he sublet the back bedroom to the defendant. (*Id.* at p. 854.) One of the officers heard voices in that room, but the tenant told him that no one else was present in the apartment and he could look. (*Ibid.*) The officer then opened the door to the back bedroom, saw drugs and drug paraphernalia, and discovered that the voices were coming from a television and a radio. (*Ibid.*) *Brown* held that the initial entry was not justified by exigent circumstances. (*Id.* at p. 856) In *Brown*, there were no facts even suggesting that someone needed the officers' assistance. Here, however, the officers were concerned about the safety of a four-year-old child whose mother was under the influence of heroin and had been evasive with the officers in discussing the neighbor's concerns.

*United States v. Gooch* (9th Cir. 1993) 6 F.3d 673 also does not assist Chavez. In *Gooch*, the police received a report that the defendant was " 'hurting people' " in a campground between midnight and 2:00 a.m. (*Id.* at p. 676.) When the officers arrived at the campground at daylight, the campground was quiet. (*Ibid.*) Without seeking a warrant, they ordered the defendant out of his tent and arrested him. (*Ibid.*) After speaking with the defendant and his companion, they searched the tent without a warrant and found a handgun. (*Ibid.*) Reasoning that there was no actual ongoing threat, the *Gooch* court held that the district court did not err in concluding that there were no exigent circumstances justifying a warrantless arrest or seizure. (*Id.* at p. 679.) Unlike in

*Gooch*, here, a very young child was present in an apartment in which his mother had recently engaged in intravenous drug use, and thus there was an ongoing threat to him.[5]

Chavez also asserts that the officers "could have alleviated their concerns by requesting that the child be brought to the door by one of the other occupants." First, the issue is whether the officer acted reasonably under the circumstances, not whether there were other reasonable courses of action. Second, had the officers requested that the child be brought to the door by Chavez or Lindley, the officers would have determined that they were also under the influence of a controlled substance and arrested them. Given that the child would then be without any adult supervision, the officers would have been required to enter the apartment to find his pants before taking him into protective custody.

Chavez next contends that even if the initial entry by Tiphayachan and Marinelli was legal, Velasquez's subsequent entry to contact the child was not. He argues that since Tiphayachan had observed that the child was in no danger, Velasquez had no reason to enter the residence to locate him. He also claims that the officer had no reason to enter the bathroom.

Even assuming that Velasquez knew of Tiphayachan's observations that the child was safe, there was no violation of the Fourth Amendment. Prior to her entry into the bedroom, the three adult occupants were being detained for being under the influence of a controlled substance. Lindley then told Velasquez that there were needles in the bedroom but would not give an exact location. Though Chavez said that the child was not near the needles, his comment was not helpful because no one knew where the child was at that point. Under these circumstances, Velasquez had "'an objectively reasonable basis for

---

[5]     *People v. Werner* (2012) 207 Cal.App.4th 1195 is also inapposite. *Werner* held that a warrantless entry into the defendant's residence was not justified under the protective sweep doctrine. (*Id.* at pp. 1209-1210.) The present case did not involve a protective sweep by the officers.

8

believing,' [citation], that 'a person within [the house] is in need of immediate aid.' [Citation.]" (*Fisher*, *supra*, 558 U.S. at p. 47.) As Velasquez was helping the child get dressed, she saw blood on the floor through the open bathroom door. Thus, the officer's entry into the bathroom was reasonably necessary to determine whether there was an additional crime victim. (*Ibid.*)

In sum, the trial court did not err by denying the motions to suppress evidence.[6]

### III. Disposition

The orders are affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.

---

[6] Since we have concluded that the trial court properly denied the motions to suppress under the emergency aid exception to the warrant requirement, we need not consider whether Williams consented to the officers' initial entry into the apartment.