Filed 3/2/15  P. v. Jones CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER JONES et al.<br><br>    Defendants and Appellants. | A139321<br><br>(San Mateo County<br>Super. Ct. No. SC076738A/B) |

Defendants Christopher Jones and Marcus Johnson pleaded no contest to one felony charge of knowingly maintaining premises for the purpose of manufacturing marijuana (Health & Saf. Code, § 11366.5, subd. (a)) after the trial court denied their Penal Code section 1538.5 motion to suppress evidence obtained during searches of their residence.  Defendants appeal the denial of their suppression motion.  We conclude there was no error in ruling on the motion, and we thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Evidence at the Suppression Hearing

Anthony and Rosalie Spiteri owned a house on Baltimore Way in Daly City that they rented to defendants.  On the morning of September 12, 2010, the Spiteris received a telephone call from a neighbor of the Baltimore Way home informing them there was water seeping out from under the garage door onto the driveway.  They drove to the house, calling their property manager on the way to ask what they should do.  The property manager told them they had the right to enter the property under the

1

circumstances, but that he would also attempt to contacts the tenants, an attempt that proved unsuccessful.

Arriving at the house, the Spiteris discovered water seeping out from under the garage door, as well as dripping out of a vent where the second story overhung the front of the garage. Describing this as "really alarming," Mr. Spiteri "knew immediately it was a serious problem."

The Spiteris rang the doorbell and knocked on the front door several times, but nobody answered. After waiting "a few minutes" to give the tenants sufficient time to answer, Mr. Spiteri "really felt like . . . somebody needed to go into the home." Using an electric garage door opener, the Spiteris opened the garage door, and water immediately rushed out onto the driveway. There was also a lot of water coming down into the garage from the second floor—"almost like walking through rain," according to Mr. Spiteri— suggesting water was seeping through the floor of the room over the garage.

Mr. Spiteri entered the house through the garage and followed the sound of running water. Walking into the bathroom, he discovered that a hose connecting the water to the toilet tank was disconnected. He tried to shut off the water but was unable to do so, so he went back outside, where a neighbor shut off the main water valve as well as the electricity.

Mrs. Spiteri, who had remained outside, wanted to know where the water had come from, and Mr. Spiteri wanted to confirm the water had been completely shut off, so they walked up to the bathroom. Mr. Spiteri confirmed water was no longer flowing out of the hose. Mrs. Spiteri noticed "weird and strange stuff" in the bathtub—black tubing that "was at least the length of the bathtub if not circled around one or two times."

The Spiteris walked out into the hallway, and Mrs. Spiteri opened the door to the closest bedroom. Inside, they saw numerous plants that were set up from "wall to wall." As Mr. Spiteri described it: "[T]here was plants that were elevated off the floor. They were kind of like, set up like a little small nursery and there was lighting above and the lighting was hanging from the ceiling." There was also piping running around the room, with holes cut into the walls to accommodate the pipes. Mr. Spiteri did not know exactly

2

what kind of plants they were, but he knew "they weren't tomato plants" and "it didn't take very long [i]n my thought process [to figure out] that it was marijuana." As Mr. Spiteri testified, "[B]y the setup of the room it doesn't take much to quickly understand what was going on." He also noticed "a very, very funny smell" throughout the whole house. Mrs. Spiteri described it this way: "I saw lights for the plants and I saw a series of plants on tables or some such thing. [¶] . . . [¶] They looked like marijuana plants based on pictures I've seen. It's in the public domain."

Mrs. Spiteri then checked at least one of the other bedrooms and found a similar arrangement. She did not see or hear anyone inside the home, but she also did not conduct a thorough inspection of the house. Mr. Spiteri also confirmed that he never saw anyone inside the house, although he did not inspect all of the closets and similar areas.

The Spiteris left the house, and Mrs. Spiteri called the police, telling them "we believed we had marijuana plants in the house." The police dispatcher instructed her to close the garage door and meet responding officers a few blocks away.

At approximately 10:56 a.m., five to 10 minutes after the Spiteris' call, Daly City Police Officers Klier, Bray, and McCarthy met the Spiteris at a school around the corner from the Baltimore Way home. Officer Bray interviewed the Spiteris, who described what they had seen at their rental home. In turn, Officer Bray contacted then-Sergeant Michel Price of the Narcotics Task Force and related the information he received from the Spiteris. Specifically, he told Sergeant Price that the Spiteris had traveled to the home to investigate a water leak; had knocked on the door and rung the doorbell but no one had answered; had gone inside; and did not think anyone was inside. He also told Sergeant Price that officers had not yet been inside the home.

Based on that information, Sergeant Price directed Officer Bray to freeze the house, a process that includes a protective sweep. Although he had no information that there were dangerous individuals or weapons inside the house, Price intended to apply for a search warrant, and it was standard protocol to freeze the premises while waiting for the warrant. He was also concerned because "residents often times don't go in and search closets . . . where suspects could be hiding."

3

Sergeant Price further testified that because the Spiteris had already gone inside the house, he felt it necessary to conduct a protective sweep before freezing the residence because if anyone was inside, they might know the operation had been discovered and try to destroy it. If the Spiteris had not gone inside, he would have ordered only that the officers freeze the house until the search warrant was obtained. Price acknowledged that even if the Spiteris had not gone inside, the knocking on the door and ringing of the doorbell would likely have tipped off anyone inside.

Officers Bray, McCarthy and Klier, along with the Spiteris, returned to Baltimore Way, and the officers conducted a brief protective sweep of the residence for the purposes of ensuring that no suspects were inside and no one was destroying any evidence. During the sweep, Officer Klier observed large marijuana plants in the bedrooms, with lighting and ventilation equipment and other items of duct work indicative of a marijuana cultivation operation. The officers did not seize anything, open any bags or containers, or go through any papers or mail, nor did they encounter any suspects.

After completing the protective sweep, the officers returned to the front of the house and secured the front and garage doors until a search warrant was obtained.

Sergeant Price arrived at the Baltimore Way house around 11:30 a.m., where he met the responding officers and the Spiteris. Officer Klier told him he and Officer McCarthy had cleared the house and had not located anyone. The Spiteris described how they had received a call from a neighbor reporting that water was leaking from underneath the garage door, so they drove over to the house. They had contacted their property management company, who advised that it would be okay to go in and turn off the water if they could not contact the tenants. They knocked on the front door and rang the doorbell but did not get a response, so they went inside. Mr. Spiteri found a water leak coming from the water supply line to the toilet. Mrs. Spiteri opened some of the bedroom doors and saw what she believed was marijuana growing inside.

In light of the information he received, Sergeant Price applied for a search warrant. In support, he submitted a statement of probable cause that stated in relevant part:

"On Sunday, September 12, 2010, at approximately 1100 hours, I received a telephone call [from] Daly City Police Officer Andre Bray who told me he responded to a call for service regarding possible indoor marijuana cultivation operation at [the Baltimore Way home]. Officer Bray told me he met with the reporting parties, Rosalie Spiteri . . . and her husband, Anthony Spiteri . . . . Officer Bray told me Mrs. Spiteri told him she and her husband are the owners of the property at [the Baltimore Way home]. Mrs. Spiteri told Officer Bray that she received a telephone call from a neighbor of [the Baltimore Way home] at approximately 1030 hours stating that she saw a large amount of water running down the driveway of [the Baltimore Way home] from under the garage doors.

"Mrs. Spiteri told Officer Bray that she and her husband arrived at [the Baltimore Way home] shortly after. Mrs. Spiteri told Officer Bray that she and her husband knocked on the front door to the residence and rang the door bell numerous times without a response. Mrs. Spiteri told Officer Bray that they use a property management company to handle their property and she called the company prior to their arrival. The person from the property management company advised her that she could enter the residence to fix the water problem if she did not receive an[] answer at the door.

"Mrs. Spiteri told Officer Bray, and later told me, that they entered the property through the garage door after activating the electronic garage door opener she had in her possession. Once they entered, they could see a large amount of water pouring through the garage ceiling. Mr. and Mrs. Spiteri then went upstairs to the bathroom above the leak and saw a waterline to the toilet was disconnected causing the water to leak. Mr. Spiteri attempted to turn off the water at the toilet but was unable to.

"Mrs. Spiteri told Officer Bray, and later told me, that she and her husband looked in the other rooms of the residence, and saw what they believed to be marijuana growing from the three upstairs bedrooms. Mrs. Spiteri stated the plants were different heights.

5

Mrs. Spiteri stated she and her husband left the residence and called the police. Shortly [a]fter, Officer Bray and other Daly City Patrol Officers arrived on scene.

"I arrived on scene at approximately 1130 hours and obtained the above statements from Mrs. Spiteri and Officer Bray. I asked Mrs. Spiteri if she had the rental agreement for the property. Mrs. Spiteri told me she was currently in the process of obtaining that information from her property management company and would provide it to me at a later date.

"I spoke with Officer Edward Klier, who told me he and Officer Donald McCarthy entered the residence to conduct a protective sweep to ensure there were no suspects inside the residence. Officer Klier told me he found no suspects, and saw three bedrooms with marijuana plants growing inside of them. He stated the plants were in different stages of growth, and estimated approximately twenty plants inside each room for a total of approximately sixty marijuana plants. Officer Klier told me he has been at indoor marijuana cultivation operations in the past, and is familiar with these types of operations."

Price received a warrant at approximately 1:00 p.m., at which time the warrant was executed.

Defendants were charged with four felonies: possession of marijuana for sale (Health & Saf. Code, § 11359), marijuana cultivation (*id*., § 11358), knowingly maintaining premises for the purpose of manufacturing marijuana (*id*., § 11366.5, sub. (a)), and theft of utility services (Pen. Code, § 498, subd. (d).)

**Motion to Suppress**

On March 27, 2012, defendants moved to suppress all evidence obtained during the searches of the Baltimore Way house.[1] They argued that the protective sweep constituted an unconstitutional warrantless search, and all evidence seized from the residence should be suppressed.

___

[1] Defendants also filed a motion to suppress evidence seized during a 2009 search of a residence in San Francisco. That motion is not before us.

The People opposed the motion, arguing first that exigent circumstances justified the warrantless entry. They theorized that it was reasonable for the officers to fear for the safety of an occupant of the residence, who could have been incapacitated, and that it was reasonable for the police to enter the property because it "was actively being damaged by the unrestrained water flow." They also argued the protective sweep of the residence was justified to insure officer safety. Alternatively, the People submitted that if the protective sweep was unconstitutional, the evidence obtained during the warrantless search and the execution of the warrant should not be suppressed because an independent source—the Spiteris—provided probable cause for the warrant.

**Trial Court's Ruling**

Following a hearing on March 12, 2013, the trial court denied defendants' motion. It first ruled the exigent circumstances doctrine did not apply. It then held the protective sweep doctrine did apply, finding that it was not unreasonable for the police to be concerned about the possible presence of suspects in the home that could have either posed a danger during a search or destroyed evidence in the house. Alternatively, it found that even if the protective sweep was unconstitutional, the marijuana grow would inevitably have been discovered based on the information provided by the Spiteris, which constituted an independent source of probable cause for the search warrant.

**Defendants' Plea and Sentence**

On April 9, 2013, defendants pleaded no contest to knowingly maintaining premises for the purpose of manufacturing marijuana, in exchange for dismissal of the remaining charges and a maximum six-month jail sentence.

On June 4, 2013, the trial court suspended imposition of sentence and placed defendants on supervised probation for three years, with the condition, among others, that they each serve 90 days in county jail.

Defendants filed timely notices of appeal.

## DISCUSSION

Defendants' sole contention on appeal is that the trial court erred in denying their suppression motion. When considering the denial of a motion to suppress evidence, we

7

view the record in the light most favorable to the trial court's ruling and defer to the trial court's findings of historical fact, whether express or implied, if they are supported by substantial evidence. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) We then exercise independent judgment to decide what legal principles are relevant, independently apply them to the facts, and determine as a matter of law whether there has been an unreasonable search or seizure. (See *People v. Davis* (2005) 36 Cal.4th 510, 528–529; *People v. Ayala* (2000) 23 Cal.4th 225, 255; *People v. Glaser, supra,* 11 Cal.4th at p. 362.)

In support of their claim, defendants first argue that the initial, warrantless search was unlawful and could not be justified as a protective sweep because the officers lacked any "specific and articulable facts" creating a reasonable inference that there was someone inside the house who presented a danger to the officers or who might destroy evidence. They also contend that neither the inevitable discovery nor independent source doctrines applied to rescue the allegedly invalid warrant.[2]

We need not address defendants' first claim—that the protective sweep was unconstitutional—because even if we were to agree, we would nevertheless conclude the suppression motion was properly denied because the information conveyed by the Spiteris constituted an independent source of probable cause for the warrant. We thus turn directly to the independent source doctrine.

" 'The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. . . . [It] teaches us that the interest of society in deterring unlawful police conduct and the public interest

_____

[2] Defendants also argue that the warrant lacked probable cause, claiming Sergeant Price omitted material, adverse information from his affidavit. In addition to the suppression motion, defendants also filed a motion to traverse the warrant pursuant to *Franks v. Delaware* (1978) 438 U.S. 154. The suppression hearing did not address the *Franks* motion, and it appears the trial court never ruled on that motion. To the extent defendants' lack-of-probable-cause argument attempts to resuscitate that motion, such as by challenging Sergeant Price's statements included in or omitted from his affidavit, we disregard it, as "the absence of an adverse ruling precludes any appellate challenge." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1179.)

in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.  [Citations.] When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'  [Citation.]"  (*People v. Weiss* (1999) 20 Cal.4th 1073, 1077–1078.)  Where the affidavit supporting a search warrant contains both information obtained by unlawful conduct as well as untainted information, a two-prong test applies to justify application of the independent source doctrine.  (*Id.* at pp. 1078, 1082.)  First, the affidavit, excised of any illegally obtained information, must be sufficient to establish probable cause.  (*Id.* at p. 1082.)  Second, the evidence must support a finding that "the police subjectively would have sought the warrant even without the illegal conduct."  (*Id.* at p. 1079; see also *id.* at p. 1082 [" 'if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, provided that the officers were not prompted to obtain the warrant by what they observed during the initial entry' "].)  The circumstances here satisfied both prongs.

Sergeant Price testified that Officer Bray, who had spoken with the Spiteris at the school, related to him what the Spiteris had seen inside their home.  Based on what he heard, Sergeant Price made the decision to apply for a search warrant, and ordered the officers to freeze the home in the meanwhile.  He thus decided to apply for the warrant based on the Spiteris' observations, before learning about what the officers saw during the protective sweep.

Turning to the contents of Price's probable cause statement and excising the observations made by the officers while conducting the protective sweep, we conclude the affidavit nevertheless contained probable cause supporting the warrant.  Price described the Spiteris' account of what prompted them to enter the house, and then stated:  "Mrs. Spiteri told Officer Bray, and later told me, that she and her husband looked in the other rooms of the residence, and saw what they believed to be marijuana growing from the three upstairs bedrooms.  Mrs. Spiteri stated the plants were different

9

heights.  Mrs. Spiteri stated she and her husband left the residence and called the police."  The Spiteris' representation that they entered their rental house due to a water leak, looked in the bedrooms, and saw what they believed to be marijuana plants was probable cause for the warrant.

Defendants challenge this conclusion, complaining that the warrant could "not issue based solely on the bare guesses of two untrained civilians who testified that they had not ever seen marijuana in person . . . ."  But probable cause requires only "a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238.)  It does not require an actual showing of criminal activity.  (*Id*. at p. 243, fn. 13.)  The circumstances leading up to the Spiteris' discovery and their opinions as to what they saw satisfied this criteria.

Defendants also contend that the inevitable discovery rule did not apply in these circumstances because "it may not be used to justify an unconstitutional warrantless search on the grounds that a search warrant would inevitably be obtained, because such a circular application of the rule would obliterate the Fourth Amendment."  As noted, we do not uphold the trial court's denial of the suppression motion by finding the protective sweep constitutional, but rather on the basis that an independent source—the Spiteris— provided probable cause for the warrant.  This argument is thus moot.

## DISPOSITION

Our independent review discloses no error in denying defendants' suppression motion, and the judgment of conviction is affirmed.

10

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Stewart, J.

11