Filed 11/6/15  P. v. Griffin CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CORDERRO DYLLON GRIFFIN,<br><br>    Defendant and Appellant. | A140784<br><br>(Contra Costa County<br>Super. Ct. No. 5-131666-0) |

Defendant Corderro Dyllon Griffin was accused of taking at gunpoint a delivery man's money and car and, following that incident, robbing and assaulting another man. As to the first incident, the jury convicted defendant of carjacking (Pen. Code, § 215, subd. (a))[1] and second degree robbery (§§ 211, 212.5, subd. (c)) with personal use of a handgun during each offense (§ 12022.53, subd. (b)). On the second incident, the jury acquitted defendant of attempted robbery but convicted him of assault by force likely to produce great bodily injury (§ 245, subd. (a)(1)). The court sentenced defendant to 20 years in prison.

Defendant appeals upon the contention that he was arrested without probable cause and evidence seized pursuant to that arrest should have been suppressed. Defendant also claims hearsay statements of an accomplice were wrongly admitted in evidence. In the following discussion we conclude that defendant was detained, not arrested, when initially stopped by a police officer but, in any event, there was probable cause for an

---

[1] All further section references are to the Penal Code except as noted.

arrest at the initiation of the contact. We also conclude that his accomplice's statements were properly admitted because defendant procured the accomplice's absence from trial by threats of violence. We shall affirm the judgment.

## Statement of Facts

Evidence was presented at trial that defendant engaged in two separate criminal incidents on a single night.

*Robbery and carjacking*

Douglas Stewart was a high school student who worked part-time delivering pizzas. He drove his sister's car, a black Chevy HHR, to make deliveries. On March 24, 2013, at around 11:00 p.m., Stewart arrived at a Pittsburgh apartment to deliver a pizza when he saw two men in front of the building, a Latino and an African-American. Stewart later identified defendant as the African-American man. Stewart asked the two men how to enter the building and defendant said he did not know but that he was "an off-duty security guard" and would radio someone. Defendant was holding a black walkie-talkie in his hand. Stewart said "never mind" and proceeded to the building. Stewart telephoned the customer to get the door's security code, delivered the pizza, collected cash payment, and exited the building.

Stewart was talking on his cell phone and approaching his sister's car when he heard the sound of running footsteps behind him. Stewart turned and saw defendant pointing a handgun at him. Defendant told Stewart: "get on the ground." Stewart was frightened. He tossed his phone aside and lay on the ground. Defendant said "give me all the money" and the car keys. Stewart complied. At this point, two other people ran up and defendant handed one of them the car keys. The robbers asked Stewart what car he was driving and Stewart, still on the ground, pointed to the Chevy with his leg. Defendant told his accomplices to "stick the key in the door." Defendant continued to stand over Stewart with a gun when Stewart heard the car engine start and the car drive away. Defendant told Stewart to stand, then directed Stewart to lie down next to a wall and stay there for at least five minutes without moving. Defendant warned Stewart that he had

people watching him. Stewart saw defendant walk away and, after waiting a while, ran to a nearby restaurant where he telephoned the police.

*Investigation of carjacking, occurrence of assault, and apprehension of defendant*

A police officer responded to the scene and Stewart gave her a full account of the robbery and detailed physical descriptions of the robbers, which the officer documented in a report. Stewart described the gunman (later identified as defendant) as "a Black male adult, approximately 20 years old, six feet tall, 180 pounds, wearing a gray sweatshirt, gray sweatpants, gray and blue Jordan sneakers, a dark beanie, he had shoulder length dreads or dreadlocks, and was carrying a red backpack." Stewart said the gunman had been holding a black walkie-talkie when Stewart first encountered him with another man outside the apartment building. Stewart described the man with defendant as "a Hispanic male adult, approximately 25 years old, about 5-5, 180 pounds, wearing a black T-shirt with gray sweatpants, with a long black ponytail and a goatee." Stewart described another man, one of the two people who joined defendant during the robbery and drove away in the car, as "a Black male in his twenties, about 5-8, 160 pounds, and bald."

The police notified Stewart's sister of the theft and she contacted OnStar Security Services (OnStar), which tracked the stolen vehicle with GPS. Within an hour of the carjacking, at about 11:48 p.m., OnStar informed the police that the vehicle was located on the 500 block of 18th Street in Richmond. Two police officers in separate patrol cars responded to the area: Officer Bell and Sergeant Pomeroy. The officers located the vehicle, which was unoccupied. In an effort to see if the carjackers would return to the vehicle, the officers conducted surveillance with each officer in a different location.

Minutes later, police dispatch reported "a man down" six blocks from the location of the stolen vehicle and Sergeant Pomeroy responded to the call, leaving Officer Bell on surveillance. Sergeant Pomeroy found a man, later identified as Jorge Hernandez, lying unconscious in the street with a stab wound to his chest.

Back on surveillance, Officer Bell received updated information about the robbery suspects that included a physical description of the gunman. Minutes after receiving the

3

information, at about 11:55 p.m., Officer Bell saw three young men running down the street. The men slowed to a walk when they saw the officer. Two men were Latino and the third was Latino or a "light skinned Black male." One of the men approached the officer and asked the time. When told the time, the man remarked to his companions that they "still had time to get to BART" and walked away. The officer did not detain the men because none matched the description of the gunman.

Within a minute or two, the officer saw defendant walking down 18th Street and entering the BART parking lot. Defendant matched the description of the gunman: "a Black male, thin build, long dreadlocks, wearing a gray hoodie, gray sweatpants" and carrying a backpack. Officer Bell drove up behind defendant, illuminated him with a spotlight, exited the patrol car and asked defendant to stop. Defendant turned to face the officer then "quickly looked to the rear as looking over his shoulder." The officer "again requested him to stop" and ordered defendant to "remove his hands from his pants pocket." Defendant complied and was seen to be wearing blue latex rubber "surgical type" gloves. Officer Bell called for backup and two officers responded.

With three officers on the scene, Officer Bell approached defendant and "detained him in handcuffs." The officer patted down defendant and found he was wearing a baseball "catcher style chest protector." The officer searched defendant's pockets and retrieved $42 in cash from his coat pocket and several keys from his front pants pocket, including a key fob with a Chevy emblem. The officer then searched the backpack, which contained two cell phones, a "two-way radio walkie-talkie style" and a water bottle. Officer Bell asked another officer on the scene, Officer Diaz, to check if the Chevy key seized from defendant opened the door to the stolen Chevy. Officer Diaz did so and confirmed that the key operated the stolen Chevy. Officer Bell arrested defendant.

Later that evening, Stewart identified defendant from a photo line-up as the gunman. A cell phone recovered from defendant's backpack was Stewart's phone.

While Officer Bell was detaining defendant, other officers were responding to the area in connection with the stabbing of Hernandez. Just after midnight, an officer saw three men running down the street then lost sight of them. A few blocks away, another

4

officer located and detained two of the men: Juan Laspada and Jesus Mariscal. The police brought the men in for questioning but, lacking sufficient evidence of their criminal involvement, released them.

*Investigation of the assault*

The stabbing victim, Hernandez, testified he has no memory of the assault. He only remembers skateboarding in Richmond then waking in the hospital. The police obtained a surveillance video from the neighborhood of the stabbing. The video shows four men dispersing. Facial features are not discernable in the video. One of the men is wearing a light colored sweat suit and backpack. Officer Bell identified the men in the video as defendant and the three men he saw running near the BART station, based on clothing, height, body build and hair style.

*Defendant's telephone call from jail*

On March 27, 2013, two days after his arrest, defendant placed a telephone call to Allen Taylor. Defendant told Taylor "I'm in jail" and "you are the only one that got away." Defendant said "I went down for the carjacking" — "[t]hey got the keys, they got the phone on me. They got all that on me." Taylor asked, "They didn't say nothing about me to you?" Defendant said "you drove the car off" but that he told the police someone named "Deveon" was driving and that there were three other men in the car, none of whom he knew. Defendant assured Taylor: "you ain't even accessory to nothing cuz they only got me to the car." Defendant asked Taylor, "where's the other two" and Taylor said he thought "they got hemmed up." Defendant said "[t]hey stabbed somebody" and the police "tried to link me to the murder" (apparently thinking Hernandez died). Defendant told Taylor the police "said that I was with two Mexicans and we got out the car and that . . . I was accessory to a murder based on that they was inside that car with me." Defendant said the police "got me on surveillance leavin" but "don't got me on surveillance robbin the cool dude." Defendant asked Taylor how he got away and Taylor said "we walked past" a police officer, asked the time, and pretended to go to the BART station. Taylor heard the police officer yell at defendant to stop. Taylor "ran and ran and

5

ran" then hid in a back yard and phoned for someone to drive him home. Defendant told Taylor the police were "looking for the hamma" and asked "[w]ho got the hammer."[2] Taylor said it "got tossed somewhere" by "[t]hat little dude."

*Mariscal's statements*

Jesus Mariscal and Juan Laspada were arrested and released on the night of the carjacking and stabbing. The police arrested Mariscal again two months later, in May 2013. Mariscal gave a statement incriminating himself, defendant, Laspada and Taylor.[3] The original complaint charged the four men as codefendants. Sometime after the preliminary hearing, Mariscal agreed to testify against defendant in exchange for a favorable plea bargain.

Trial commenced against defendant alone in October 2013. The day before his scheduled appearance at trial, Mariscal told the prosecutor he would not testify because defendant threatened to kill him and his family. The prosecutor moved to introduce Mariscal's May 2013 statement to the police and his October 2013 statement describing the threat from defendant. The trial court found that defendant procured Mariscal's unavailability as a witness and, applying the rule of forfeiture by wrongdoing, held the statements admissible. (Evid. Code, § 1390; *Davis v. Washington* (2006) 547 U.S. 813, 833.)

A redacted version of Mariscal's audiotaped May 2013 interview with the police was admitted in evidence and played for the jury. In the interview, Mariscal says defendant pretended to be a security guard when the pizza delivery man walked up to him and defendant. Defendant, Laspada and Taylor then talked about robbing the delivery man. Mariscal denied participating in the robbery. Mariscal said he walked away from the robbery discussion and was on his way home when Taylor drove up in a car with Laspada as a passenger. Defendant then ran up and entered the car. The four men drove to a house in Richmond but, after seeing the car was equipped with OnStar, decided to

[2] A police officer testified that "hammer" is slang for a semiautomatic firearm.

[3] Mariscal knew defendant by the nickname "Bo-bo."

6

"get rid of it" by driving it to the BART station and leaving it there. After abandoning the car, the men wanted to ride BART, but only defendant had money and he refused to share the $40 he took from the delivery man. Defendant said "let's go walk up here real quick" and Mariscal "figured" the other men "wanted to go rob somebody else." Mariscal was walking ahead of the others when he turned and saw that defendant, Laspada and Taylor had stopped a "skateboard guy." Mariscal walked back to join the group. One of Mariscal's companions asked the skateboarder "where's the money" and he did not answer. Laspada said "Man, he looks like a scrap" and "that was when everything escalated."[4] All four men started "jumpin' on him, tryin' to get sumpin'." Mariscal said he punched the skateboarder, then he and Laspada held him as Taylor stabbed the victim in the ribcage. Taylor and Laspada continued "roughing him up." The skateboarder started screaming and the men dispersed. Mariscal, Laspada and Taylor walked past a police officer at the BART station and Taylor asked the officer for the time. The three men were waiting for defendant at the BART station when they heard the officer order defendant to stop. The three men ran and then Taylor broke away when police officers drew near. Mariscal and Laspada were arrested.

The jury also heard a redacted version of Mariscal's October 2013 interview with his attorney and the prosecutor in which Mariscal informed counsel he would not testify because he received a threat from defendant while both men were in custody. Mariscal said Griffin sent a "kite"—slang for written jail communication—that was read aloud to him through an air vent. Defendant told Mariscal that if he testified, "things" would happen to him and his family.

*The defense*

The defense did not deny the robbery and carjacking of Stewart, but defense counsel argued to the jury that the "case was overcharged" because there was no proof that a firearm, rather than a fake gun, was used in those offenses and "no reliable evidence" of defendant's participation in the charged robbery and assault of Hernandez.

---

[4] "Scrap" is a derogatory term for people affiliated with the Sureño gang.

The defense presented a firearms expert who testified that some pellet guns are designed to look like firearms and are often indistinguishable by sight. The defense also introduced Mariscal's initial statement to the police denying involvement in the offenses and testimony that Mariscal stabbed a man in a bar fight in 2010. Defense counsel argued that Mariscal is "a criminal and a liar" whose statements implicating defendant could not be trusted.

**Discussion**

1. *The motion to suppress evidence was properly denied.*

Defendant appeals denial of his motion to suppress evidence. (§ 1538.5.) Defendant contends he was effectively arrested when Officer Bell first stopped him and placed him in handcuffs and that the arrest was without probable cause to believe defendant was involved in the carjacking or armed robbery. The Attorney General argues that defendant was detained, not arrested, when initially contacted by Officer Bell but, in any event, there was probable cause for an arrest at the initiation of the contact. We agree with the Attorney General on this point.

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362 (*Glaser*).)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manual G.* (1997) 16 Cal.4th 805, 821.)

"When the seizure of a person amounts to an arrest, it must be supported by an arrest warrant or by probable cause." (*People v. Celis* (2004) 33 Cal.4th 667, 673 (*Celis*).) But "[a] brief stop and patdown of someone suspected of criminal activity is

8

merely an investigative detention requiring no more than a reasonable suspicion." (*Id.* at p. 674.) "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.)

At the hearing, Officer Bell testified that he ordered defendant to stop walking and remove his hands from his pants pockets, and when defendant stopped but failed to remove his hands, the officer unholstered his Taser and held it at his side, at which point defendant complied. Defendant was handcuffed about 30 seconds later, when a backup officer arrived. Defendant claims there was a de facto arrest when Officer Bell drew his Taser and handcuffed him.

" '[T]here is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests. Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.' " (*Celis, supra,* 33 Cal.4th at pp. 674-675.) "[S]topping a suspect at gunpoint [and] handcuffing him" does "not convert a detention into an arrest" if the actions of the police do not go "beyond those necessary to effectuate the purpose of the stop." (*Id.* at p. 675.) Police officers are justified in holding a suspect at gunpoint and handcuffing him—without probable cause for arrest—where the police have information the suspect is dangerous. (*Glaser, supra,* 11 Cal.4th at p. 366.)

Officer Bell was justified in stopping defendant for an investigatory detention. Defendant was found walking within 50 yards of the stolen car, an hour after the carjacking and closely matched the victim's physical description of the gunman: "a Black male, thin build, long dreadlocks" who was "wearing a gray hoodie [and] gray sweatpants." Officer Bell was also justified in drawing his Taser and handcuffing defendant after defendant—who was reasonably suspected of being armed—failed to remove his hands from his pockets when asked to do so. Officer Bell's actions went no

further than those necessary to effectuate the purpose of the stop. (*Celis, supra,* 33 Cal.4th at pp. 674-675.)

Upon stopping defendant, the officer was authorized to make a protective pat-down search for weapons "designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer" (*Terry v. Ohio* (1968) 392 U.S. 1, 29) and to seize an object that was not a weapon if its incriminating character was "immediately apparent" (*Minnesota v. Dickerson* (1993) 508 U.S. 366, 375-376). Officer Bell's trial testimony describes an initial patdown search for weapons that found the incriminating car key in defendant's pants pockets followed by a search of defendant's backpack. The officer's testimony at the hearing was abbreviated and not clear as to the exact sequence of events. Officer Bell said he placed defendant in handcuffs then "searched both his person and his backpack," which could be interpreted as a full custodial search of defendant.

In any event, probable cause to arrest defendant exists even if defendant was subjected to a de facto arrest when he was handcuffed. " 'Probable cause exists when the facts known to the arresting officer would persuade someone of "reasonable caution" that the person to be arrested has committed a crime. [Citation.] "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts . . . ." [Citation.] It is incapable of precise definition. [Citation.] " 'The substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' " and that belief must be "particularized with respect to the person to be . . . seized." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 474.)

"To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." (*Maryland v. Pringle* (2003) 540 U.S. 366, 371.) In this case, a car was stolen in Pittsburgh by an armed man and several others. The car was driven to Richmond where it was located by GPS an hour later, near midnight. Police surveillance of the car revealed no one in its vicinity until three men were seen running in the area. A couple

10

minutes later, defendant appeared on the scene; he closely matched the victim's description in race, body build, hair style and clothing. When Officer Bell called to defendant to stop, defendant "quickly turned and looked behind him." The officer told defendant to take his hands out of his pockets. Defendant did not comply until the officer took his Taser from his holster. This evidence, viewed in its totality, provided probable cause to arrest defendant.

2. *Mariscal's statements were properly admitted.*

The rule of forfeiture by wrongdoing permits admission of a witness's hearsay statements where the defendant procures the witness's absence from trial through threats of violence. (Evid. Code, § 1390; *Davis v. Washington, supra,* 547 U.S. at p. 833.) Defendant accepts the rule but contends there is "no competent evidence that [defendant] had in fact made any threats." Defendant argues that Mariscal's report of threats is unreliable because Mariscal is an alleged accomplice and there is insufficient corroborating evidence of the claimed threats. We conclude, in the following discussion, that Mariscal's statements were corroborated and properly admitted.

A defendant has the constitutional right to confront witnesses but "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (*Davis v. Washington, supra,* 547 U.S. at p. 833.) California's hearsay rule is in accord. "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." (Evid. Code, § 1390, subd. (a).) Our hearsay rule further provides that proof of the above elements shall be established by a preponderance of the evidence and "shall not be based solely on the unconfronted hearsay statement of the unavailable declarant, and shall be supported by independent corroborative evidence." (*Id.*, subds. (b)(1), (b)(2).)

There is ample corroborating evidence that defendant procured Mariscal's refusal to testify. Mariscal said defendant threatened him by using a "kite" (jailhouse writing) that was read aloud to him by a woman inmate through an air vent. The trial court

11

credited the means of conveyance, noting that inmates use such means to send messages between Contra Costa County jail buildings and women are housed in the same building as Mariscal. The court also noted that the alleged threat was received the night after defendant "spent two full days in court" during which "a number of things occurred." The court proceedings concerned in limine motions with an extensive discussion of Mariscal's expected testimony. The discussion included the fact that Mariscal was a reluctant witness who feared retaliation for testifying against defendant. The trial court properly found the timing of the alleged threat corroborative, as the threat was reportedly made on the eve of trial after the witness's importance—and susceptibility to coercion—was communicated to defendant.

The trial court also noted that the recorded interview between the prosecutor and Mariscal concerning the threat includes a highly detailed description of the threat that is self-authenticating. Mariscal, asked to provide an exact account of the message he received, said he was told: "bruh, I heard that, I heard my attorney [tell] me that you're taking three, bruh, that's messed up they're tryin to give me 11 years bruh, I'm not, I'm not playing with you, . . . if you sit here and testify, things are going to happen to you, you don't want nothin' to happen to you or your family bruh. Don't say nothin'. Uh, me and Laspada can get off if you don't testify. . . . He said don't testify cuz if you do I'm going to put it all over the internet and, and that's that. But basically if you don't want nothing to happen to you and your family bruh, don't testify."

Mariscal said he knew the message came from defendant because "his street name was used . . . and how the person came about it was just eager to do it like he's been talking about me for a long time. And this isn't the first time I've been hearing about him talking about me. I've been hearing about him a lot, all the time, but I just been ignoring it and shaking it off. . . . [B]ut now it's just out the window . . . his street name was used . . . and she read it just how he wrote it in the kite and how he would speak it."

Mariscal's report of the threat is further corroborated by the content of the threat that refers to a plea bargain offer made to defendant. Mariscal reported that defendant said, "I heard my attorney [tell] me that you're taking three, bruh, that's messed up

12

they're tryin to give me 11 years." The prosecutor had, in fact, offered Mariscal a three-year sentence and defendant an 11-year sentence. The 11-year offer to defendant was not public knowledge and Mariscal had no known source for the knowledge apart from the threatening communication from defendant. The prosecutor did not tell Mariscal's attorney. Mariscal's attorney confirmed she never told Mariscal, and Mariscal and defendant never appeared in court together.

The prosecutor presented sufficient proof that defendant threatened Mariscal and did so with the intention, and result, of preventing him from testifying. Mariscal's statements were properly admitted in evidence.

**Disposition**

The judgment is affirmed.


_____

Pollak, Acting P.J.


We concur:


_____

Siggins, J.


_____

Jenkins, J.

13