Filed 2/5/16  P. v. Burton CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MIKEL DEVONTAY BURTON,<br><br>        Defendant and Appellant. | A144476<br><br>(Contra Costa County<br>Super. Ct. Nos. 04-181187-6, 05-141619-7) |

After the trial court denied his motion to suppress, defendant Mikel Devontay Burton pled no contest to possession of a firearm with a prior juvenile adjudication, a felony.  He was sentenced to three years' probation.  Defendant now appeals, arguing the trial court erred in denying his motion to suppress.  Defendant also argues the conditions of his probation were improper.  We affirm the judgment, but modify certain aspects of defendant's probation.

## I.  BACKGROUND

Defendant was charged by information with (1) possession of a firearm with a prior juvenile adjudication (Pen. Code,[1] § 29820); (2) possession of a concealed firearm (§ 25400, subds. (a)(2), (c)(4)); and (3) possession of a loaded firearm by a prohibited person (§ 25850, subds. (a), (c)(4)).  Defendant moved to suppress pursuant to section 1538.5, arguing the firearm at issue was discovered during an unconstitutional

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

detention and search. That motion was denied. Defendant subsequently pled no contest to the first count, and was sentenced to three years' probation.

The search at issue took place on the afternoon of June 5, 2014. Officer James Colley was patrolling the "Sycamore corridor," an area of Contra Costa County known to have numerous shootings and homicides, with F.B.I. Special Agent Matt Ernst in a marked police vehicle. Colley was in a full police uniform, and Ernst was wearing a raid-style vest with "F.B.I." emblazoned on the front and back.

Colley noticed three Black males—one inside a vehicle and two standing outside it—in a carport, and stopped short of the carport to investigate. The officers exited their vehicle and approached. Colley did not activate the vehicle's lights or siren and did not draw his weapon. He asked the males what they were doing, and one of them, Antonio Adam, responded they were "just hanging out" and doing some vehicle repair. Colley said there was "basic toolbox type stuff, [like] wrenches" laying around the area. At one point before backup arrived, Colley mentioned the men were loitering.

While Colley was speaking with Adam, he saw Deon Clark seated in the passenger compartment of the car "fumbling with something inside." When Colley asked Clark what he was doing, Clark said he was trying to move some marijuana out of the officer's view because he was on probation. Colley took Clark's name and checked it for wants and warrants and then searched his person. Outside of "the little bit of marijuana," Colley did not find anything of significance.

Meanwhile, defendant was standing with his back against the carport listening to music on his headphones. Agent Ernst was standing near him. According to defendant, Ernst was standing to the side of him, about two or three feet away. Defendant testified Ernst asked him for his name, date of birth, address, and Social Security number. Defendant also claims he asked Ernst if he was free to leave, but Ernst did not respond. Colley testified defendant was "free to go" at that point, though he later conceded, "[I]f you really want to look at it, you could feel that . . . [defendant] didn't feel free to leave because he had an F.B.I. agent standing right in front of him." Ernst did not testify, and Colley did not know what he said to defendant.

2

Three backup officers, including Officer Ted Chang, later arrived on scene. Colley testified he radioed for additional units around the same time he searched Clark, and the backup arrived one or two minutes later. Chang stated he arrived on the scene before Clark was searched, as he recalled Colley searching him. Chang approached defendant and asked him if he had identification. Defendant said he did not. Chang then asked defendant if he had any "dope" or weapons. Defendant said he had a gun in his pocket. Chang placed defendant in handcuffs and located a loaded .45-caliber semiautomatic pistol on his person.

## II. DISCUSSION

### A. *Motion to Suppress*

Defendant argues he was unlawfully detained because the officers lacked reasonable suspicion he was engaged in criminal activity. We conclude defendant's interaction with the officers began as a consensual encounter. While it eventually became a detention, by that point the officers had developed a reasonable suspicion to detain.

#### 1. Standard of Review

The People bear the burden of justifying a warrantless search or seizure. (*People v Suff* (2014) 58 Cal.4th 1013, 1053.) In cases such as this, where "the prosecution relies on consent to justify a warrantless search or seizure, it bears the 'burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority. [Citation.]' [Citation.] Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure." (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

"As the finder of fact in a proceeding to suppress evidence (Pen. Code, § 1538.5), the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable. [Citation.] Accordingly, in reviewing the instant suppression order, we consider the record in the light most favorable to [the People] as respondents since 'all factual conflicts must be resolved in

3

the manner most favorable to the [superior] court's disposition on the [suppression] motion.' [Citation.] But while we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, we exercise our independent judgment in determining the legality of a search on the facts so found." (*People v. Woods* (1999) 21 Cal.4th 668, 673–674.)

## 2. Law Governing Detentions

"The Fourth Amendment to the United States Constitution prohibits seizures of persons, including brief investigative stops, when they are 'unreasonable.' [Citations.] . . . A seizure occurs whenever a police officer 'by means of physical force or show of authority' restrains the liberty of a person to walk away." (*People v. Souza* (1994) 9 Cal.4th 224, 229.) A police officer may conduct a brief, investigatory stop of a person when the officer has a reasonable suspicion criminal activity is afoot. (*Terry v. Ohio* (1968) 392 U.S. 1, 30 (*Terry*).) Put another way, a detention is reasonable "when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza*, at p. 231.) "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123.)

While reasonable suspicion is necessary to justify a detention, consensual encounters with police that result in no restraint of liberty do not trigger Fourth Amendment scrutiny. (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) "An officer may approach a person in a public place and ask if the person is willing to answer questions. If the person voluntarily answers, those responses, and the officer's observations, are admissible in a criminal prosecution. [Citation.] Such consensual encounters present no constitutional concerns and do not require justification." (*People v. Brown* (2015) 61 Cal.4th 968, 974.)

In assessing whether an encounter is consensual or constitutes a detention, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." (*Florida v. Bostick* (1991) 501 U.S. 429, 439.) Put another way, the primary question is whether, in light of the totality of the circumstances, "a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." (*U.S. v. Mendenhall* (1980) 446 U.S. 544, 554, fn. omitted (*Mendenhall*).)

### 3. Analysis

In denying the motion to suppress, the trial court concluded the interaction with defendant began as a consensual encounter, explaining Colley was entitled to walk up to defendant, Adam, and Clark and ask what they were doing. The trial court also found that within two minutes of approaching the group, Colley detected illegal activity. At that point, the trial court concluded, the officers "have a right to secure that area and the people who are in that area where they're doing their duty. And they have a right to be secure . . . where they're doing their official duty." We agree with the trial court's conclusion and reasoning.

As an initial matter, we agree Colley and Ernst did not initially detain defendant. When the officers first pulled up to the carport where defendant was standing, they did not draw their weapons, activate their sirens or lights, or command defendant to stop. Colley parked his vehicle some distance away from the group, and did not block their car. And while both Colley and Ernst could easily be identified as police officers, there is no evidence they rushed onto the scene or immediately accused defendant or his associates of engaging in illegal activity. "There were neither threats nor any show of force." (*Mendenhall*, *supra*, 446 U.S. at p. 558.) The officers merely asked the men what they

were doing. The question was open-ended, and was not inherently accusatory. (See *id.* at p. 553 ["Police officers enjoy 'the liberty (again, possessed by every citizen) to address questions to other persons' "].) There is also evidence Colley mentioned the men were loitering. But it unclear when this comment was made. It is also unclear whether defendant even heard the comment as he was listening to music on his headphones and did not mention the remark during his testimony. Since the officers' conduct did not rise to the level of a detention, the officers were entitled to engage in that conduct without a reasonable suspicion of criminal activity.

Very soon after the officers arrived on scene, they discovered evidence of illegal activity. Colley saw Clark "fumbling" with something inside the car. When asked what he was doing, Clark admitted he was in possession of marijuana and that he was on probation. At that point, the officers had a reasonable suspicion to detain Clark. They also had reason to secure the area and detain Clark's associates, including defendant. For safety reasons, the officers could not be expected to turn their back on defendant while they searched and detained Clark. (See *People v. Glaser* (1995) 11 Cal.4th 354, 374 [when initiating search warrant police officers may detain unknown persons on premises to protect the safety of all present during the detention].) Given defendant's proximity to Clark and Colley—he was standing only a few feet away—Ernst was entitled to ensure defendant did not pose a threat and would not interfere with the search. Moreover, as the trial court observed, the detention was not overly intrusive. The officers did not draw their weapons, and the detention lasted no more than a few minutes.

Defendant argues Ernst detained him by corralling him against the wall of the carport. The testimony at the preliminary hearing indicates Ernst was standing either in front of or just to the side of defendant and asked him for his name, address, and Social Security number. According to defendant, Ernst was standing about two or three feet away from him and did not respond when defendant asked if he was free to leave. Once backup arrived, defendant was also confronted by Officer Chang, and he and the other suspects were outnumbered five to three. We agree this conduct amounts to a detention. But there is substantial evidence it occurred after Clark admitted to being in possession of

6

illegal narcotics.[2] At that point, there were safety reasons for detaining defendant and securing the area.

Defendant also argues the officers lacked a reasonable suspicion to detain him based solely on his association with Clark. In support, defendant cites to *Sibron v. New York* (1968) 392 U.S. 40 (*Sibron*) and *Ybarra v. Illinois* (1979) 444 U.S. 85 (*Ybarra*). In *Sibron*, a police officer observed the defendant talk with several persons the officer knew to be drug addicts. (*Id.* at p. 45.) The officer later approached the defendant in a diner, told him to come outside, and said, " 'You know what I am after.' " (*Ibid.*) The defendant then handed the officer several envelopes containing heroin. (*Ibid.*) The court held the heroin was inadmissible. As an initial matter, the officer lacked probable cause for arrest, as it was not reasonable to infer a person who talks with narcotics addicts is engaged in criminal activity. (*Id.* at p. 62.) Moreover, the officer lacked grounds to seize and search the defendant as there was no reason to believe the defendant was armed and dangerous, and the officer was "not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries." (*Id.* at pp. 63–64.)

In *Ybarra*, a warrant was issued authorizing the search of a tavern and its bartender for controlled substances. (*Ybarra*, *supra*, 444 U.S. at p. 88.) In executing the warrant, an officer proceeded to pat down each of the nine to 13 customers present in the tavern. (*Ibid*.) In doing so, he discovered heroin on the defendant's person. (*Id.* at pp. 88–89.) The court held the heroin was inadmissible. Citing *Sibron,* the court held "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." (*Ybarra*, at p. 91.) The court also rejected the argument that the patdown constituted a reasonable frisk for weapons under *Terry*. (*Ybarra*, at p. 92.) The court reasoned the officer had no reason to

---

[2] Ernst did not testify, and the only evidence of the timing of his actions came from Colley, who said Ernst was standing near defendant as Clark was being searched. Defendant testified Ernst approached him and asked for various personal information, but defendant did not specify when this happened.

believe the defendant was armed, and his presence at the tavern was insufficient to create a reasonable suspicion. (*Id.* at pp. 93–94.)

The instant action is distinguishable. Unlike in *Sibron*, defendant was detained while a search and arrest were ongoing. Moreover, *Ybarra* was concerned with the *search* of bystanders. No question was raised as to the legality of the detention. (See *People v. Glaser*, *supra*, 11 Cal.4th at pp. 367–368, fn. 3 [distinguishing *Ybarra* on similar grounds].) Here, the officers did not search defendant until after he admitted to having a firearm. Initially, they merely detained him and asked for his name and other personal information. Moreover, unlike in *Ybarra*, the officers here knew something more about defendant than just his "propinquity" to Clark. Defendant, Clark, and Adam were the only individuals in the area at the time, and thus the officers had reason to believe they were together.

As the detention of defendant was legal, the trial court properly denied defendant's motion to suppress.

## B. *Probation Conditions*

Defendant challenges his probation conditions on several grounds. First, he argues there is a discrepancy between the trial court's oral pronouncement of the weapons condition and dangerous drug condition and the conditions appearing on a preprinted order of probation. Defendant argues that when the written version of a condition conflicts with the trial court's oral pronouncement, the court's oral pronouncement should control. We agree (see *People v. Gabriel* (2010) 189 Cal.App.4th 1070, 1073), and conclude the written weapons and drug conditions must be modified to reflect the conditions orally imposed by the court.

Next, defendant argues the weapons condition is unconstitutionally vague. That condition states: "[Y]ou cannot own or possess or have under your custody or control any rifle, shotgun, firearm, any kind of weapon, any ammunition." Defendant contends the term "any kind of weapon" is imprecise and leaves open whether he is barred from possession of any object capable of causing serious injury that could conceivably be used as a weapon, such as screwdrivers and scissors. We are not persuaded. In this context,

8

the condition plainly prohibits the possession of items specifically designed as weapons, as well as other items that defendant may intend to use to inflict great bodily injury.

Defendant also challenges the drug condition, which states: "You cannot use or possess any dangerous drugs, narcotics or narcotic paraphernalia without a prescription." Defendant asserts the term "dangerous drugs" is unconstitutionally vague. Defendant's claim has merit, since "dangerous drugs" can be interpreted in different ways. As we stated in *People v. Gaines* (2015) 242 Cal.App.4th 1035 (*Gaines*): "Various drugs could be considered dangerous when used for legitimate medical purposes, even if used with a prescription. In fact, Business and Professions Code section 4022 defines a 'dangerous drug' as one that cannot be used without a prescription. Likewise, over-the-counter drugs could be considered dangerous if used in sufficient quantities." (*Id*. at p. 1041, fn. omitted.) We reject the Attorney General's argument that "dangerous drugs" is merely shorthand for various classes of narcotics described in the Health and Safety Code. "[T]he current Health and Safety Code does not clearly define the term, and probationers and probation officers may be unfamiliar with this particular shorthand." (*Gaines*, at p. 1041.) Accordingly, in the interest of clarity and precision, we further order that "controlled substances" replace "dangerous drugs" in the disputed probation condition.

Defendant also argues the weapons and drug conditions should be modified to include an express knowledge requirement. We have rejected substantially similar challenges in the past. (See *Gaines*, *supra*, 242 Cal.App.4th at pp. 1039–1042.) As we have previously explained, "not every category condition is vague merely because it does not require the probationer to know a particular association, place, or item is within the prohibited category. A probation condition passes constitutional muster so long as it spells out with reasonable specificity what is prohibited in such a way that persons of common intelligence need not guess at its meaning or differ as to its application." (*Id.* at p. 1038.) Such is the case here. It is unclear how defendant could possibly be confused about what the weapons condition prohibits him from doing. Nor are we persuaded that

9

defendant could be held in violation of his probation in the unlikely event he somehow unknowingly possesses a firearm or illicit substance.

### III. DISPOSITION

We affirm the judgment and trial court's order denying the motion to suppress. We modify the written probation conditions concerning defendant's use and possession of drugs and weapons to conform to the court's oral pronouncements. We also modify the drug condition to state: "You cannot use or possess any controlled substances, narcotics or narcotic paraphernalia without a prescription."


_____
Margulies, J.


We concur:


_____
Humes, P.J.


_____
Banke, J.